### In re PHILADELPHIA & READING COAL & IRON CO.

### No. 19711.

District Court, E. D. Pennsylvania.

Feb. 27, 1945.

On Requests for Reargument April 19, 1945.

Morgan, Lewis & Bockius and Arthur Littleton, all of Philadelphia, Pa., for debtor.

Sur Applications for Allowances.

KIRKPATRICK, District Judge.

*General Considerations*

■ 1. In fixing compensation for services in reorganization, especially counsel fees, the value of the estate in the custody of the Court is always an important consideration because it tells something of the character of the services and affords a fairly accurate measure of the skill required to perform them with success and the responsibility assumed.

When this debtor filed its petition under § 77B, 11 U.S.C.A. § 207, in 1937 it had a total outstanding funded indebtedness consisting of mortgage bonds and debentures amounting to $53,000,000 (round numbers will generally be used throughout this opinion). The book value of its assets was about $71,700,000. The examiner reported the value of the assets (excluding undeveloped coal lands) as of June 30, 1941, at $20,000,000. Since that date the Compa-

ny has earned $19,000,000, less interest and depreciation, or say $14,000,000. Cash disbursements amounting to $7,300,000 have been made. The market value of its two issues of bonds on the New York Stock Exchange as of November 24, 1944 (the Company being on that date still in reorganization), was $26,750,000. For the 12 months ending September, 1944, its net earnings available for interest on its present funded debt, were $5,600,000 which, capitalized at 12½ per cent, gives a value of $44,800,000. As of the last mentioned date the debtor had current assets of $14,760,000.

Taking all the foregoing factors into consideration I shall assume the value of the estate to be $32,000,000, it being understood that this is a rough estimate made solely for the purpose of obtaining a starting point in fixing the fair value of professional and other services.

2. The proceedings lasted nearly eight years, and in a number of cases the petitioners were active throughout that entire period. It seems a long delay but a good deal of it could not be avoided (e.g. the time when progress was suspended pending the report of the examiner and the period, after submission of the plan to security holders, when there was uncertainty as to the Government's tax program and its effect upon the proposed reorganization). The first part of the period was necessarily occupied in (1) putting into effect a drastic program of economy which involved the debtor's divesting itself of the tremendous tax burden arising from its ownership of undeveloped coal land far in excess of its needs, cancellation of unprofitable coal leases and sales of numerous properties deemed unadvisable to hold, (2) obtaining the necessary capital to keep the enterprise afloat and (3) establishing the right of the debtor in possession as against the mortgagee to use the income from the mortgaged properties and collateral in operating the business and administering the estate. All this had to be accomplished before any real start toward reorganization could be made. During this period there was always a possibility of liquidation, and the work done unquestionably contributed to the ultimate reorganization of the Company. Nor can it be said that this postponement of the submission of a final plan was in the long run detrimental. In four or five years, the expansion of markets as a result of the war, plus the

steps described, plus efficient management converted an extremely precarious situation into one far more advantageous than anyone in the early stages could reasonably have believed possible.

■ 3. The debtor is quite able to pay the full reasonable expenses of reorganization, even though they add up to a pretty large amount of money, without adversely affecting its cash position. It has on hand cash or the equivalent in the amount of $11,500,000. Ability to pay was one of the items suggested as proper for consideration by the Circuit Court of Appeals in Steere v. Baldwin Locomotive Works, 3 Cir., 98 F.2d 889, 891 and by this Court in Re Pine Hill Colleries, D.C., 46 F.Supp. 669. It is by no means a controlling factor nor can it operate to increase allowances beyond a reasonable amount, though inability to pay might work the other way. At any rate the Court, in this case, need not be concerned about the possibility of crippling the reorganized company by overburdening it with administration expenses.

■ 4. Certain considerations arising from the present abnormal conditions may properly be taken into account. They are: The increased cost of doing business for lawyers and other persons engaged in rendering professional or expert services of all kinds, increased tax burdens, tax reductions which the debtor may obtain for such expenses as can be classed as operating costs and the fact that, due to the war, the larger law offices have been practically stripped of their younger associates, with the result that a much larger percentage of the work has to be performed by lawyers whose services ordinarily command higher compensation.

5. The total amount of requests for allowances now presented is about $1,100,000. Something over $400,000 has already been paid out for expenses and interim allowances, making a total in excess of $1,500,-000 or a little less than five percent of the value of the estate. Making a rough grouping of the requests, it appears that counsel for the debtor in possession asks for $300,000, creditors, creditors' committees and their attorneys ask for nearly $700,000 (including expenses), the special master, the examiner and the examiner's counsel and the consulting engineers employed by the examiner, a total of about $200,000. Counsel for the debtor (the Corporation, as distinguished from the debtor in possession, the Company) $34,000 and the indenture trustee and its counsel about $45,000. The balance is to reimburse various parties for expenses incurred in connection with their services. No attempt will be made to fix a general rule, percentagewise, as to what a reorganization of this kind should cost, though, obviously, the larger the estate, the lower the percentage should be. However, the relation of the requests to the total value of the estate is a factor which must be kept in mind and I have stated the above figures merely to indicate that it is one of the bases for my conclusions.

■ 6. The Securities and Exchange Commission, by their counsel, appeared and, based on what was obviously a painstaking appraisal of the value of the services, made with the permission and at the request of the Court a full statement supported by reasons, covering all the requests, and supplemented it by the Commission's recommendation as to the reasonable value of compensation properly chargeable against the estate in each instance. Participation by the Commission in this way is always of the greatest value to the Court and I have given the recommendations careful consideration. Counsel for the Corporation has submitted a brief in which he argues, "the statement of the S.E.C. on this subject is in an entirely different category from the report which the statute authorized the Commission to file with respect to a plan of reorganization, and that no more weight should be given to the statement of the S.E.C. on the subject of allowances than would be given to any other statement by any other party to the proceedings." I agree with this statement, with the qualification that it is proper to have in mind that the Commission is about the only wholly disinterested party in the proceeding and that, while it may not be entirely familiar with "the problems of making both ends meet in a law office" referred to by counsel, its experience has made it thoroughly familiar with the general attitude of the Courts and the amounts of allowances made in scores of comparable proceedings.

■ 7. Of the approximately 25 separate applications for allowances, formal objections were interposed against only one, namely, that of Mr. Palmer. Thereafter Mr. Palmer orally made objections to the request of counsel who had filed the objections and also to that of counsel for the

Philadelphia Debenture Committee. The absence of objections is a matter to which some courts have given consideration. In re Mortgage Guarantee Co., D.C., 40 F. Supp. 226, 232. At best, however, in my opinion it is of very slight value as evidence of the reasonableness of the requests. This is particularly true in the present case in view of the participation of the Securities and Exchange Commission. The recommendations of the Commission were in almost every instance, for reductions, some of which were very drastic. It is not improbable that in many cases objections would have been filed by various parties had such action by the Commission not been expected.

There are in addition some principles which apply particularly to claims for services on the part of creditors' committees, attorneys, accountants and other agents engaged by them. They may be noted as follows:

■ 8. It goes almost without saying that work done by creditors and their attorneys in furthering private individual interests and having nothing to do with the reorganization or not contributing to it in any way can not be paid for out of the estate. A fortiori, work the effect of which, if successful, would be to obstruct or thwart the reorganization is not compensable. In addition, however, creditors and their attorneys can not always be allowed full compensation from the estate, even for services which do contribute to the final result. See In re Standard Gas & Electric Co., 3 Cir., 106 F.2d 215. Claimants of this class come into the proceedings employed by and representing private interests, but the cost of · their services will be largely borne by parties other than those who have employed them. As to their principals and clients, their position is no different from that of a lawyer in any private employment, but, as to the estate, they act in a quasi-public capacity.

Another reason for the rule lies in the matter of duplication of work. In the present case, for example, there were four creditors' committees and two very small independent groups of creditors. Each committee and its attorneys began their work by a study not only of the history and the particular problems of the debtor but of the problems of the entire industry— a very proper and necessary preparation. This study may have accounted for a good many weeks. Indirectly, it was a contri-bution to the reorganization but during that preliminary period all four committees were doing the same thing. Other creditors, and committees for that matter, might have seen fit to participate and if they had they would have needed similar preparation. This is one kind of work which can not be fully compensated on the basis of the total time expended on it by all of those who did it.

It is, of course, impossible to arrive at any formula by which to apportion the obligation to compensate creditor services which contribute to the reorganization between the estate and the individual interests represented. The best that can be done with the rule is to take it as a cautionary pronouncement, and that is apparently what it was intended to be, for the Court in the Standard Gas & Electric case stated its conclusions in the most general terms, saying merely that creditors and their counsel "cannot expect to be compensated at the rate which similar services would command in purely private employment."

9. The petition was filed in 1937, and reorganization began as a 77B proceeding, with the debtor in possession. The duties of the examiner, appointed in 1940, did not include the preparation of a plan. Had this proceeding been begun under Chapter X or had all the provisions of that statute been put into effect much of the burden of that work would have fallen to a trustee. However, it having been obvious from the beginning that the Company was insolvent, the preparation and negotiation of a plan were, at all stages, very largely in the hands of the creditors, involving somewhat more extended services than might be expected by present-day standards.

10. The reorganization has been successful and the plan finally adopted is apparently satisfactory to all interests. Involving as it did a rather nice question of adjustment between mortgage bondholders and the debenture creditors, the fact that there has been comparatively little dissent or criticism manifested indicates unusually constructive and cooperative work on the part of the creditor interests involved.

*Counsel for Debtor*

■ In this case, no trustee having been appointed, the position of counsel for the debtor in possession corresponds in some respects to that of counsel for a disin-

terested trustee. The request is for a total of $300,000, which includes an interim allowance in the amount of $80,000, already paid. In addition, for services not related to the reorganization but rendered in connection with the operation of the debtor's business, this firm has received $1,000 a month or about $94,000 and, for special services in several important litigated matters in which they represented the debtor, the sum of $88,500. As to the last two items, no question has been raised and we are here concerned only with the request for allowances for reorganization services.

The services of counsel for the debtor were performed continuously and touched on almost everything that was done in the proceedings from the beginning to the end. A detailed account of them would simply be a history of the entire eight years' reorganization and is not deemed necessary.

The firm does not keep hourly time-sheets but the Securities and Exchange Commission, in accordance with a method of its own, estimated from the records and counsel's statements that the firm spent approximately 41,000 hours on reorganization work. The Commission doubts the accuracy of its estimate and believes that the time actually spent was much less. However, even if it be assumed that the estimate is as much as 25 percent too high, the request would be at the rate of $10 an hour, which can hardly be called excessive in an employment involving as much responsibility as this. If the estimate is anywhere nearly correct the claim would be on the basis of $7.50 or $8 an hour. I see no reason to reduce this allowance below the amount requested and it will be approved in the total amount of $300,000.

*Indenture Trustee*

■ Correctly apprehending its duties under the trust indenture as trustee for the mortgage bondholders, this bank entered the proceedings almost at their inception and actively participated from beginning to end. However, a considerable portion of the services for which compensation is claimed by it and its attorneys cannot be said to have contributed to the plan or to have been beneficial to the administration of the estate. I refer to its strongly pressed efforts first, to have sequestered and impounded for the benefit of the mortgage bondholders all income arising from the mortgaged property after the beginning of the proceedings and second, to have paid to it dividends and interest on stocks and bonds pledged as collateral. Both of these proceedings were carried to the Circuit Court of Appeals and in both the applications were finally denied. As to the first, there can be little doubt that, had the position of the indenture trustee been sustained, it would have made the reorganization of the debtor as a going concern "well-nigh impossible," Central Hanover Bank, etc., v. Philadelphia & Reading Coal & Iron Co., 3 Cir., 99 F.2d 642, 645. Liquidation at a staggering loss to all other interests would have followed as the only alternative. As to the second, though it did not involve so large a percentage of the debtor's income, its final refusal was predicated upon the Court's finding that it would have deprived the debtor of income needed to carry on its operations. As to both, although the proceedings were entirely proper and were not wholly without benefit to the estate in that they resulted in a determination of certain basic rights it cannot be denied that they were conducted entirely in the interests of one class of creditors and were inimical to the interests of all other parties concerned as well as to the purpose which the proceeding was designed to accomplish. Some of the other steps taken by the indenture trustee are to some degree in the same general category. While I do not question that the whole amount claimed represents the fair and reasonable value of the services both by the bank and its counsel, I cannot, for the reasons stated, charge the full amount against the Company in reorganization. I will allow the requests as follows:

Central Hanover Bank & Trust Co., Trustee, $10,000.

Rathbone, Perry, Kelly and Drye, Counsel for Central Hanover Bank & Trust Co., $15,000.

Barnes, Dechert, Price and Smith, Philadelphia Attorneys, $5,500.

*Philadelphia Bondholders' Committee and Counsel*

■ There were two committees representing holders of the Refunding Mortgage bonds. There were placed with the depositary of the Philadelphia Committee more than $10,000,000 of the $24,000,000 of bonds of this issue outstanding, or approximately 40 percent. This representation amounted to between 20 to 25 percent of the value of all claims against the debtor and was probably the most important credi-

tor interest appearing in the proceedings. In the preparation of the plans and amendments as well as the negotiations which resulted in the final adoption of the 1941 plan this Committee took a leading part. I think that it may be said fairly that it generally assumed the initiative, although, so far as I know, it took no step of importance in connection with the plans without the active cooperation of counsel for the debtor and the Philadelphia Debenture Committee and its counsel and, in a lesser degree, that of the New York Committees and their counsel. In addition, it advised with counsel for the debtor and made constructive proposals in connection with the more important operating problems, such as the divestiture of the surplus coal lands and the borrowing of $2,500,000 working capital.

In presenting their request counsel stated that a higher charge could and would have been made for an equal amount of work for a private client. I can well accept that statement as correct. The amount requested is not in excess of a reasonable fee for the total work done. However, this Committee joined in the two proceedings brought by the Indenture Trustee to have the income from the mortgaged and pledged assets turned over to the sole use of the mortgage bondholders, and its counsel, though little more than nominal participants in the first and more important of the two, actively carried the burden of the second. As pointed out in connection with the request of the Indenture Trustee, this portion of the services, though within the duties of both committee and counsel under their employment and undoubtedly a proper charge against the bondholders, is not compensable by the estate. I fix the reasonable value of such portion of the services at $7,500 and an allowance from the estate will be made in the amount of $92,500.

 The request of the Committee itself, in the amount of $34,000, is, in my judgment, too high. For the first five years of its service this Committee employed a special assistant or representative to study and analyze the affairs of the debtor and after he was elected a director of the Company he continued to confer with and report to the Committee. The Committee has already been allowed approximately $10,000 for his services. He was, in effect, an additional committeeman and the one who did most of the spade work.

The Committee reports that it held 51 meetings, although it does not suggest that this represents 51 full days. The members of the Committee were men of wide experience and unquestioned standing. I have carefully considered their statements of services and I accept it as having been made in all good faith, but as with counsel's services, a portion is not compensable out of the estate. To allow the Committee the compensation requested would bring the total paid to them up to nearly one-half of the allowance to their counsel and that, I think, would be out of all proportion to the fair value of the work done by them. An allowance of $15,000 will be made, which is in addition to the payment already made.

### Philadelphia Debenture Committee and Counsel

 This Committee did not employ a depositary but held powers of attorney to represent some $13,000,000 of debentures out of a total of $29,000,000. This was the largest face amount of claims represented by any committee. The two New York committees together represented about $7,600,000, and it is obvious that the two Philadelphia committees with a total of over $23,000,000, each representing close to a majority of the bonds of its class, were bound to be the dominant factors in the formulation and adoption of any plan. This was actually the situation. The plan of reorganization finally approved was largely the work of counsel for the two Philadelphia committees in collaboration with counsel for the debtor. In the final stages of the reorganization the critical point was the adjustment of interests in the reorganized company between the mortgage bonds and the debentures of the old company, and the agreement between these two committees as to a proper formula, based on the examiner's report, more than any one thing, accomplished the final result. While the New York committees, after the plan had been substantially worked out, participated in the negotiations and made many suggestions, some of which had some effect upon the plan as finally adopted, the fact is that, without the support of the Philadelphia committees the reorganization could hardly have been consummated, whereas, without that of the New York committees, it probably could. Counsel for the Philadelphia Debenture Committee thought its allowances should fairly bear the relation of 85 to 100 to the amount re-

quested by the Philadelphia Mortgage Bondholders' Committee, and I agree. I think that $85,000 represents the fair value of counsel's work properly compensable out of the estate, and the request will be allowed.

■ The Committee asks for an allowance of $22,000. One of its members acted as secretary and devoted a great deal of his time to its work in much the same capacity as that occupied by Mr. Moss for whose services the Philadelphia Bondholders' Committee has been allowed $10,000. Having in mind the relationship between the value of services of counsel and of committee members, the Committee's request is allowed in the amount of $20,000.

### New York Committees and Counsel

These two Committees have made the following requests:

Counsel for Bondholders' Committee, $120,000.

New York Bondholders' Committee, $60,000.

Accountant for Bondholders' Committee, $5,000.

Counsel for New York Debenture Bondholders' Committee, $75,000.

New York Debenture Bondholders' Committee, $25,000.

■ The requests are supported by affidavits indicating that the Committees and their counsel actively participated in the proceedings throughout and spent a great deal of time in their employment. Accepting without question their statements that the work was done and the time spent and, with the knowledge that Committees and counsel were thoroughly competent, I still think that it must be perfectly plain to anyone who is familiar with the proceedings and the parts played by the representatives of the various interests that these applicants have greatly overestimated the value of their services to the reorganization and that their requests, especially when considered in comparison with those of the Philadelphia Committees, are very far out of line indeed. Of course, the fact that they represented very much smaller interests than the Philadelphia Committees is by no means a controlling factor but it may be considered. Bearing in mind that, under the statute I am concerned only with fair value of reasonably necessary services which contribute to the plan or which are beneficial in the administra-

tion of the estate, I fix these allowances as follows:

Counsel for the New York Bondholders' Committee (including Philadelphia counsel), $55,000.

■ New York Bondholders' Committee, $15,000. This amount does not include any compensation for Mr. Johnson whose request I am compelled to disallow because of his purchase of bonds, innocent though it was, after the beginning of his employment. It is, however, intended to include an allowance to the accountant employed by the Committee.

■ Counsel for New York Debenture Bondholders' Committee, $35,000.

■ This includes an allowance to Mr. Bortin. His wife traded in the securities of the Company. during the period of his employment but I accept his testimony that he did not know of it, did not advise her in connection with it and never discussed with her the affairs of the Company. The objection of the Securities and Exchange Commission is based upon the broad proposition, as stated by its counsel, that "In our view, the trading by a wife is the same as trading by a husband." It might be desirable to reframe the statute to read that way, because it would eliminate opportunities which now exist to nullify its provisions. However, the "direct or indirect" provision of Section 249 refers, I think, to the character of the interest acquired or transferred by the claimant for compensation—for example, trading in stock of a holding corporation owning stock or bonds of the debtor. In any event, I do not think that trading by a wife without the consent, advice or knowledge of the husband is trading by him or for his account either directly or indirectly.

New York Debenture Bondholders' Committee, $12,000. This includes an allowance to the Secretary of the Committee, Mr. Coe, and also to Mr. Egan, who, it appears, made full disclosure of any possible adverse interest which he might have had.

### Archibald Palmer, Counsel for Creditors

This request is for $75,000. Mr. Palmer first appeared in the proceedings in the latter part of 1938, representing at that time $88,000, principal amount of debenture bonds, or somewhat less than one-third of one percent of the total face value of the issue. There is no doubt about the

fact that that class of creditors was already adequately represented. Two committees were in the field and had been actively participating in the proceeding for about a year. Mr. Palmer states that he now represents something over $250,000. Measured by the actual value of the interests represented, the responsibility assumed by him, when he entered the case, was, in comparison with those representing other creditor interests, practically nil, and is at the present time, accepting his own statement as to his representation, trifling.

 Under the Act as it originally stood, I would have had no hesitation in dismissing this claim without discussion, on the authority of In re Paramount Publix Corporation, 2 Cir., 85 F.2d 588, 592. That was a § 77B reorganization but, even under Chapter X, compensation is not guaranteed to every creditor or lawyer who enters and takes part in a reorganization proceeding. Much that was said in the opinion of Judge Hand in the Paramount Publix case is fully applicable to Chapter X proceedings, particularly the following: "Usually it is proper to award compensation to individuals or relatively small groups only where no one is in the field to protect the interest of the individual or class for which the person or small group speaks, and under all circumstances compensation should be allowed only where services are reasonably required, whether those rendering them be committees or individuals." Under Chapter X leave to intervene may not be necessary but the character and extent of the services rendered must be examined to ascertain whether they contributed to the plan or were beneficial in the administration of the estate and if they meet these requirements then to what extent they were more than unnecessary duplication of equivalent services by others. Unless services of an attorney are compensable under these principles the amount of time and effort expended by him is beside the point.

 Actually there is little or nothing to support the present claim except the extravagant amount of time (estimated by Mr. Palmer as 6,000 hours) which he devoted to his enterprise, the number of days on which he appeared before the Court and the master, and the number of pages of testimony (probably not less than 4,000) attributable to his appearances. Almost all of this was, so far as any progress toward reorganizing the Company is concerned, pure waste, causing needless additional expense in an unascertainable amount, registering in increased charges of the master and court reporter and added fees for a great deal of compensable work imposed upon counsel for the debtor and for other creditor interests, none of which would have been incurred but for Mr. Palmer's intervention. It may be possible to find some faint trace of contribution to the plan or of benefit to the administration of the estate in all this, but even beneficial services do not command compensation to the extent that their value to the estate is nullified by unnecessary expense, loss and delay created by the method of their performance. The reasoning upon which the Commission appraised these services at substantially the same value as those of counsel for the Philadelphia Debenture Committee, is hard to understand. I certainly cannot agree that the so-called "airing" of the various charges of fraud against the present management of the debtor, which the applicant pressed in the earlier stages of the reorganization, were in the slightest degree beneficial to the estate. They were totally unfounded (Judge Kalodner described one instance of them as "totally reckless and unjustified" a remark equally applicable to most, if not all.) and not only increased legal costs but compelled the officers of the debtor to spend a good deal of time in preparing for and attending the hearings instead of in the operation of the Company's business.

I am unable to find any margin of benefit to the estate in Mr. Palmer's activities or any justification for awarding any compensation to either him or his accountant, and his application is denied.

*Counsel for the Philadelphia & Reading Coal & Iron Corporation*

 Mr. Johnston represented the Corporation, having been regularly retained by resolution of its Board of Directors to represent it in the reorganization proceedings. It owned the entire capital stock of the debtor. His position thus corresponds in a general way to counsel representing the debtor in a Chapter X proceeding in which a trustee has been appointed. Compensation for an attorney for the debtor is provided for in Section 241 of the Act, 11 U.S.C.A. § 641, and the considerations which govern creditors and their attorneys are not wholly applicable. In the case of this request there is no question of requiring the applicant to look to private in-

terests for any portion of his compensation. In any event I think that Mr. Johnston's entire services contributed to the plan and were beneficial in the administration of the estate. The only question is as to the amount. Mr. Johnston was active only during the first four years of the proceedings although he participated in it to some slight extent thereafter. He estimates that he and his assistants spent 1,200 hours on this matter. For this he has already been allowed $2,500 and claims $33,500 additional which would make his compensation at the rate of about $30 an hour. Without attempting to fix a per hour standard of value for lawyers' services in reorganization proceedings, I can say that I think that this request, particularly as compared with a number of others in this proceedings, is too high. I fix the reasonable value of the services at $17,500 or $15,000 in addition to the allowances already made.

*Counsel for Certain Mortgage Bondholders*

██ Although Mr. Ryan's request is extremely modest, the benefit derived by the estate from his participation is scarcely discernible. His request will be allowed in the amount of $500.

*Trustee under Debenture Trust Instrument*

This request is allowed in the amount of $3,000.

*Counsel for Trustee under the New Mortgage*

██ Although counsel did not draw the mortgage and although the amount of time spent by them was comparatively small, they assumed, in advising the new trustee, duties involving a very high degree of responsibility. Their request in the amount of $2,000 will be allowed.

*Depositary for Philadelphia Bondholders' Committee*

The Girard Trust Company has asked for an allowance of $41,271,85 for its services as Depositary for Philadelphia Bondholders' Committee. This request is higher than any allowance for similar services with which I am familiar, but that does not necessarily mean that it is excessive. The depositary has supported it with detailed testimony as to its costs. Obviously, the actual cost of doing work of this kind (quite different from services of a professional nature) is a factor of prime importance in determining whether the request is reasonable. The request is based upon a system of cost accounting recently installed by the bank and criticized by the Securities and Exchange Commission as inaccurate. The Commission bases its recommendation of $18,000 upon its knowledge of charges usually made for similar services in other reorganizations. Presumably those charges were based on a method of accounting different from that employed by this bank. I do not feel that I have before me sufficient information from which to determine the correctness of the bank's estimate of its costs and will, therefore, postpone final allowance for further consideration. An interim allowance of $18,000 will be made.

It is understood that wherever, in the foregoing opinion, an allowance has been made to a group (as a committee), the amount so allowed is to be divided proportionally between the individual members in the group on the basis of their individual requests.

Sur Requests for Compensation and Reargument.

In entering the final order of March 29, 1945, the Court reserved for further consideration the request for compensation of the Depositary for the Philadelphia Bondholders' Committee. Subsequently a rehearing was allowed upon that part of the order which dealt with the requests of the Indenture Trustee and its counsel. These two matters will now be disposed of.

*Request of Depositary*

The Depositary contended that the sum requested by it was less, by several thousand dollars, than the actual cost of the work, and therefore reasonable. Recently, at a conference with some of the Depositary's officers as well as accountants and counsel for both it and the Securities and Exchange Commission, the Depositary's system of cost accounting was reviewed and explained to me, and I have also studied the additional data submitted at that time. As a result, I find that the claim is not in excess of what it cost the Depositary to perform its services and that there has been no inefficiency of operation or duplication of effort unnecessarily increasing the cost.

 I agree that cost is a very important factor in determining compensation allowable for services of this kind, but the criterion, as in the case of all requests for compensation, is the reasonable value of the services to the estate. This makes it proper to consider several other factors.

One of them is the usual charge allowed for similar services. It may be true, as suggested by the depositary, that many institutions undertake employment of this kind and present their claims without knowing accurately what the work costs them. Even so the reasonable value to the estate should not be fixed in disregard of customary charges.

In the opinion it was stated that the request is higher than any allowance for similar services of which the Court is familiar. I have studied all reported cases called to my attention by counsel, and several others.* Because of the brevity of the discussion in the reported opinions it is not possible to be sure about one's conclusions but I still think that such comparisons as can be made show that statement to be substantially correct.

This reorganization lasted longer than any in the cases noted but in making comparisons proper consideration must be given to the fact that a depositary's services consist of numerous items, diverse in character, and adjustments should be made therefor. As the Securities and Exchange Commission correctly points out the length of time during which the Depositary had the bonds in its possession is relevant only to the items of its claim for custody and for maintenance of accounts. It has nothing to do with the other items for which compensation is requested, such as receiving bonds for deposit, issuance of certificates of deposit, transfers, etc.

Entirely aside from allowances in other cases, the relation of the request to other allowances in this case must also be considered in determining reasonable value. An allowance which would appraise the Depositary's services at more than 40 percent of those of counsel for the Mortgage Bondholders' Committee, nearly 50 percent of those of counsel for the Debenture Committee, more than twice those of counsel for the Corporation, (stockholder) and more than twice those of counsel for the Indenture Trustee, seems to me wholly unjustifiable in terms of value to the estate.

I recognize that a final judgment into which these and other elements enter cannot attain scientific accuracy, but it is the kind of judgment that I must make. I fix the reasonable value to the estate of the Depositary's services recited in its petition at $30,000. I also allow the amount of $3,900 for services performed after the request was filed.

## Claim of Indenture Trustee and Counsel

Reargument upon these requests was ordered in view of the strongly pressed contention that the Court, in disallowing compensation for such part of the services as were rendered in connection with (a) the sequestration and impounding petition and (b) the interest and dividend petition, misunderstood the purpose of these two proceedings and the effect of the decisions rendered. I am quite willing to accept without reservation the statement of counsel for the Indenture Trustee that, in filing and pressing the sequestration and impounding petition, they were taking a step which was usual in equity foreclosures and receiverships and that the purpose was simply to perfect the mortgage lien upon such portion of the net income remaining after payment of operating expenses of the whole enterprise as might thereafter be allocated to the particular mortgaged property. However, in the Third Circuit the law was already clearly established that, in bankruptcy proceedings, such action on the part of the Trustee was unnecessary and that a mortgagee's failure to assert its claim to income of mortgaged property did not affect its right thereto. Associated Co. v. Greenhut, 3 Cir., 66 F.2d 428. Naturally, in view of this well settled rule, both Judge Dickinson and the Circuit Court of Appeals assumed that the objective of the petition was more far-reaching than a mere declaration of rights and dealt with the petition as one for physical sequestration and impounding of income which, in terms, it was. A reading of the opinion of the Circuit Court of Appeals (Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co., 3 Cir., 99 F.2d 642, 645) makes it plain that this was the view of that Court. Judge Maris said, "The sequestration of substantially all the Debtor's current income would undoubtedly so impede its operation as a going concern as to render well nigh impossible its reor-

---

* In re Alleghany Corporation, D.C., 16 F.Supp. 75; In re United Cigar Stores of America, D.C., 21 F.Supp. 869; In re Paramount-Publix Corp., D.C., 12 F.Supp. 823; In re Davison Chemical Co., D.C., 14 F.Supp. 821; In re Consolidation Coal Co., D.C., 14 F.Supp. 845; In re United Railways & Electric Co. of Baltimore, D.C., 15 F.Supp. 195; In re Standard Gas & Electric Co., D.C., 26 F.Supp. 636.

ganization as such. Consequently it was entirely proper for the court below to refuse to order the physical sequestration and impounding by the Debtor for the benefit of the bondholders of the income of the mortgaged property." Certainly this language indicates that the Court understood that the issue of physical sequestration was before it and that, in affirming Judge Dickinson's order, it was ruling against the Indenture Trustee upon that specific issue. The Court noted the suggestion that the purpose of the proceeding was merely to fix the Mortgagee's rights, saying "for this purpose, however, an adjudication by the court below was unnecessary." From the opinion of the Circuit Court of Appeals, it seems clear that had it reversed Judge Dickinson's order, the effect of its decision, according to its own view of what was involved in the case, would have been that the Indenture Trustee was entitled to have the income physically impounded and sequestered for its benefit; and the Indenture Trustee was before the Court seeking a reversal. Had such ruling been made (albeit under a misunderstanding of the original purpose of the Trustee), it is hard to see how the Trustee could have refused to take full advantage of it for the bondholders, and the result would have been, as the Circuit Court of Appeals apprehended, the defeat of the reorganization proceedings.

In common with both Judge Dickinson and the Circuit Court of Appeals, as well as counsel for the Debtor (whose printed brief I have read), I may have misconceived the Indenture Trustee's *purpose* in instituting the proceeding but, in view of what the Circuit Court of Appeals said, I do not think I misunderstood what the effect would have been had it succeeded. I must take the case as I find it. At best the proceeding was useless. In re Reading Hotel Corporation, D.C., 25 F.Supp. 10, affirmed, 3 Cir., 105 F.2d 572, this Court held that services rendered in opposing a successful and confirmed plan of reorganization were not compensable out of the estate where it appeared that the only persons who could have derived any benefit from the disapproval of the plan were the stockholders, whom the claimant represented.

As to the interest and dividend petition, there is no question of misunderstanding either purpose or effect. In that petition the request was that the interest and dividends from pledged securities be paid directly to the Indenture Trustee. These items amounted to a considerable sum and it would be something of an understatement to say that their diversion to the bondholders would not have been beneficial to the estate. The only question is whether the solution of the somewhat doubtful point of law involved was a contribution meriting reward. The Trustee argues that the "protection and assertion of claims—by litigation if necessary—by the representatives of each group of creditors of the interests of their own class must, therefore, be the nature of the services 'beneficial to the estate' for which allowances are to be paid." This is true when what is involved is the adjustment of conflicting interests within the frame of the reorganization but I doubt that it holds good where the claim in litigation is an attempt to take funds needed for operating the business clear out of the proceedings and out of the jurisdiction of the Court. The Trustee also argues that it would have been remiss in the performance of its duty if it had not asserted this claim, and that may be so, but the duty in question was one that it owed to its bondholders rather than the Court or the estate in reorganization. I therefore hold to the views expressed in the opinion.

One consideration, however, was suggested by counsel for the Securities and Exchange Commission which, I think, has merit. The Indenture Trustee itself, as distinguished from counsel representing it, based its claim for compensation largely on time and cost of performing services of a more or less routine and mechanical nature. Undoubtedly the proportional part of such services chargeable to the proceedings referred to above would be very much smaller than in the case of the lawyers and therefore the fraction of the request disallowed should be correspondingly smaller. I, therefore, allow the Indenture Trustee for its services, instead of $10,000, the sum of $16,000.

The Trustee has asked that, in the event that the Court's disallowance of any portion of the fees requested be adhered to, the order of November 27, providing for the retention of $275,000, against possible liabilities of the Indenture Trustee, be modified to permit this fund to be charged with the disallowed balance of attorneys' fees. This fund was part of the money formerly on deposit with the Trustee as security under the mortgage, and, therefore, part of the mortgaged property to which the Trustee's general lien for compensation and

expenses originally applied. The Court will entertain a petition for authorization to make such modification, upon proper notice to any parties adversely affected. In such petition it may be assumed that the Court is satisfied that the total, fair and reasonable value of the services performed by the Indenture Trustee and its counsel is as stated in the requests.

