**In the Matter of ALDERSGATE FOUNDATION, INC., Debtor.**

**Bankruptcy No. 74–383 Orl BK P.**

United States Bankruptcy Court,
M. D. Florida,
Orlando Division.

April 29, 1981.

Lee Jay Colling, Orlando, Fla., for Frank W. Reed and also as Successor Trustee.

Don M. Stichter, Tampa, Fla., for debtor.

van den Berg, Gay & Burke, Orlando, Fla., for indenture trustee, Commercial Bank of Winter Park (ComBank).

Johnie A. McLeod, Apopka, Fla., for Mr. and Mrs. Brewer and Omega Corp., creditors.

Jerome Bornstein, Orlando, Fla., for the Unofficial Bondholders Ass'n (Bondholders).

J. R. Trinkle, Plant City, Fla., for certain bondholders (the Coulter Group).

K. Rodney May, Washington, D. C., for Securities and Exchange Commission.

## ORDER ON APPLICATIONS FOR FINAL ALLOWANCES

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a pre-Code Chapter X corporate reorganization proceeding and the matters under consideration are applications for final allowances filed by the following parties: The Estate of Frank W. Reed, the original trustee, now deceased; Lee Jay Colling as attorney for Frank W. Reed and also as Successor Trustee; Don M. Stichter, attorney for the Debtor; the law firm of van den Berg, Gay & Burke, attorneys for the Indenture Trustee, Commercial Bank of Winter Park (ComBank); Johnie A. McLeod, attorney for Mr. and Mrs. Brewer and Omega Corporation, creditors; Mr. Jerome Bornstein, attorney for the Unofficial Bondholders Association (Bondholders); and, J. R. Trinkle, attorney for certain bondholders (the Coulter Group). In order to put these Applications in proper focus a brief recap of the history of this corporate reorganization is in order.

Aldersgate Foundation, Inc. (Aldersgate) is a non-profit corporation originally organized to provide low cost rental housing, restcare, nursing care and related services to the elderly. It owned and operated two complete care and retirement facilities, one located in Kissimmee and the other in Orange City, Florida. It also owned unimproved real property in Leesburg and Englewood and an unfinished high-rise facility located in Key West. It has no shareholders or paid-in capital. It is a church related organization and received some contributions from the members of the congregation. All of its properties were acquired with borrowed funds obtained through the issuance of bonds under a Trust Indenture entered into with ComBank who consented to act as Trustee under the Trust Indenture. The bonds were secured by first mortgages encumbering the various properties of Aldersgate. Three bond series with an aggregate principal outstanding balance of $6.6 million encumbered the Orange City center, the properties located in Key West, and the portion of the Englewood property. Three other series of bonds in an aggregate principal balance outstanding of $12.4 million encumbered different portions of the Kissimmee center. The properties in Kissimmee were also encumbered by a purchase money mortgage held by the original owners of the property, Mr. and Mrs. Brewer (the Brewers) securing an indebtedness in the approximate principal balance of $1.3

million. The Brewers' mortgage, however, was subordinated to the first mortgages securing the various bonded indebtednesses.

Because of charges of mismanagement, the Securities Exchange Commission (SEC) commenced a receivership proceeding against Aldersgate in the United States District Court, but following an unsuccessful attempt by a court appointed management committee and later by a receiver appointed by the District Court to rehabilitate Aldersgate, Aldersgate filed a voluntary petition for relief under Chapter X. Mr. Frank W. Reed, now deceased, who was initially appointed as receiver, was appointed to serve as the reorganization trustee, and Mr. Lee J. Colling who represented Mr. Reed as receiver was appointed to represent him in the Chapter X proceeding.

During the first four years, the trustee operated both retirement centers, one in Kissimmee and one in Orange City and was generating a gross income of $15.8 million and after expenses, a total net income of $3.4 million. The trustee was also liquidating some non-income producing properties. Initially there were seven reorganization plans filed by the trustee, by the Brewers and by the Unofficial Bondholders Association and by other bondholders respectively. Each of these plans were to be funded by outside investors. Of course, each proponent vigorously opposed and challenged the plans filed by others. Initially all seven plans were rejected and the Court directed the trustee to prepare an internal plan based on the concept that Aldersgate will continue to function as a tax-exempt enterprise. The second plan submitted by the trustee contemplated that the Kissimmee center will be operated and the trustee will make a cash distribution derived from liquidation of non-income producing properties and securities and also certificates of value to the bondholders and to unsecured creditors to be serviced from future operating revenues derived from the Kissimmee facility. The trustee's plan was subsequently amended to include an optional provision providing for the sale of the Kissimmee center. This plan was ultimately approved by the Court and was accepted by 92% of the bondholders, but was rejected by the Brewers who controlled the majority of the unsecured claims.

The Trustee thereafter embarked upon an extensive campaign of advertising the Kissimmee center for sale and with court approval, issued an invitation to submit sealed bids for the Kissimmee property. By the deadline fixed by the Court the Trustee received several bids, the highest was for $11 million. Among the bidders were two independent nursing home enterprises, Friendly Retirement Center (FRC) and the Ev. Lutheran Good Samaritan Society, Inc. (Good Samaritan). Good Samaritan was the third highest bidder with the bid of $9 million and FRC's bid was $8.4 million. When FRC increased its offer to $11.5 million and offered to settle all claims of the Brewers, which represented a major roadblock to any reorganization effort, the Court permitted the highest bidder to withdraw its bid and authorized the sale of the Kissimmee facility to FRC.

FRC, after having obtained several extensions to close the sale, was not able to procure the necessary funds to close prior to the expiration of the last extension and its $500,000 earnest money deposit was declared by the Court forfeited. The order of forfeiture was challenged by FRC. The Order had been affirmed on appeal by the District Court. This matter is currently pending before the Fifth Circuit Court of Appeals. After a bitter contest between Good Samaritan and FRC, this Court ultimately authorized the trustee to sell the Kissimmee facility for $9.7 million to Good Samaritan. While the Brewers' interest ultimately supported the Good Samaritan offer and so did ComBank, the successor trustee opposed it on the ground that the offer was too low.

The proceeding during the past six years produced 26 adversary proceedings; 21 appeals, 12 of which involved the sale of the Kissimmee center and all of which were unsuccessful. The funds realized from the liquidation of the assets indicate that making an allowance for the cost of administra-

tion and applying the previously fixed surcharge formula would permit a distribution to the Kissimmee bondholders, a dividend of 67.5%; a dividend of 93.7% to the Orange City bondholders; a dividend of 46.6% to the Englewood bondholders; a 77% dividend to the Key West bondholders; and a 43.9% dividend to the unsecured creditors. The surcharge formula previously noted was fixed at 64.3% on the interest of Kissimmee bondholders; 21.0% on the Orange City bondholders; 2.1% on the Englewood bondholders; and 6.3% on the Kissimmee bondholders and unsecured creditors. This allocation is based on the administrative expenses to be charged according to the values of the assets available and the value of the unencumbered chattel collateral of the respective bondholders.

## INDIVIDUAL APPLICATIONS

Mr. Frank W. Reed, now deceased, was a retired mortgage loan officer at the time he was appointed trustee for Aldersgate on September 27, 1974. As noted earlier, he also served for three months as receiver in the equity receivership. Mr. Reed served until November 18, 1978, the date of his death, and during this period he devoted full time to the trusteeship. According to the application he spent 8,463.75 hours devoted to his trusteeship duties. Mr. Reed was charged with the duties of overall planning and policy decisions; had general supervision of the day-to-day operation of the two operating facilities, one in Kissimmee and one in Orange City, although the facilities were in the initial charge of the several department heads and other employees.

Prior to his appointment, Mr. Reed before his retirement earned between $18,000 and $20,000 as a loan officer. He was awarded a fee of $9,500 by the District Judge for his services in the receivership for services rendered over a 3 month period which, if projected on an annual basis, would represent an annual compensation of $38,000. The duties performed by Mr. Reed as a receiver were basically the same as those he performed as trustee. In all fairness he had the additional burden of processing 3,300 claims and developing a plan of reorganization. In this connection, it should be noted that the trustee's initial plan was rejected and was not found feasible and the Trustee initially resisted the sale of Kissimmee to Good Samaritan. While there is no direct evidence in this record to establish what was the compensation of an executive in a comparable position in the area during the relevant period, an affidavit of an accountant submitted after the hearing states that an executive of a multi-facility retirement center earned in the area of $50,000 a year. In this connection, it should be pointed out, however, that according to the time record only ⅓ of Mr. Reed's time was spent in the actual operation of the Kissimmee and Orange City facilities and the balance was spent on the performance of the general duties of the trusteeship not related to operation of a business.

Mr. Reed seeks a compensation of $423,150 which is based on an hourly rate of $50. Mr. Reed received $1,000 per month as an interim allowance totalling $47,500 leaving a requested balance of $375,650. The application also seeks a reimbursement of expenses mostly travel totalling $10,824.26, all but $1,133.44 of which has already been paid.

## FEE APPLICATION OF LEE JAY COLLING, COUNSEL FOR TRUSTEE AND AS SUCCESSOR TRUSTEE

Mr. Colling, an experienced attorney, was appointed as counsel for the trustee on October 4, 1974 after serving as Mr. Reed's attorney during the receivership. When the trustee, Mr. Reed, died Mr. Colling was appointed as successor trustee. Since November of 1978 he served in the dual capacity as trustee and as attorney for the estate. Mr. Colling filed separate applications as attorney and successor trustee. He seeks a total allowance of $886,051 and crediting the interim allowances heretofore received in the amount of $275,938.52, he now seeks an allowance of the balance of $610,112.50 as attorney for the Trustee. He also seeks the reimbursement of out-of-pocket expenses totalling $33,334.12, all but $13,-

021.44 of which has been paid. According to the time sheet submitted, Mr. Colling and four attorneys associated with him in his firm expended 10,144 hours during the period ending August 31, 1980. Mr. Colling seeks a compensation at the hourly rate of $100 for the services rendered; by Mr. A. J. Stanton, Jr. and Mr. Douglas B. Beattie, his partners, at the hourly rate of $85 and $75 respectively. He also seeks an allowance for the services rendered by Mr. Charles R. George, III, an associate, at the hourly rate of $65 and Mr. Robert Hendren at the hourly rate of $50.

As noted earlier, Mr. Colling served as counsel for the receiver where the Chief Judge of the District awarded Mr. Colling $10,500 or $41 per hour for 250 hours of service. Mr. Colling stated at that time that his overhead was about $25 per hour leaving a profit of approximately 40%. The weighted average of overhead costs for his firm during the proceeding was less than $39 per hour most of which has been defrayed through interim payments totalling nearly $276,000.

As successor trustee, Mr. Colling recorded an additional 655.9 hours for services performed by him. For these services, he requests a total of $32,795 or a compensation at the hourly rate of $50. After crediting interim allowances in the amount of $15,-000, Mr. Colling seeks the balance of $17,-795 as an allowance for his services as successor trustee. Mr. Colling did supervise the operation of the Kissimmee center until it was sold in July of 1979, but did not operate any facility since and devotes basically his time as successor trustee to the general administration of the estate.

### FEE APPLICATION OF DON M. STICHTER, DEBTOR'S COUNSEL

Mr. Stichter, an experienced attorney in bankruptcy matters, was retained in January of 1976 by the founder of Aldersgate to represent the Debtor in the Chapter X proceeding. The Debtor was not represented by counsel during the first 15 months of the proceeding. Mr. Stichter initially requested a compensation of $20,000 for 350 hours of service representing an hourly rate of $57. His application, which was amended, was increased to $27,000 for the identical 350 hours which represents a compensation at the rate of $77 per hour. This change was based solely on Mr. Stichter's reassessment of the applicable hourly rate. He is seeking reimbursement of expenses in the amount of $532.55. Mr. Stichter did not receive any interim allowance.

An examination of the application for allowances by Mr. Stichter reveals that he devoted only 30 hours assisting the trustee and the trustee's counsel in connection with the controversy relating to the tax-exempt status of Aldersgate. The balance of Mr. Stichter's services consisted of reviewing documents; monitoring developments of the case; counseling the Debtor, that is, the founder of Aldersgate and members of its pre-petition board of directors and basically advocating the position of the Debtor. For instance, he unsuccessfully attempted to dismiss the reorganization case; to have Aldersgate restored to possession of the church facilities located in Kissimmee; to block the confirmation of the second plan of the trustee; and to block the sale of the Kissimmee facility to Good Samaritan. It is evident that none of these services represented any benefit to the estate. But, notwithstanding he seeks compensation for the total time spent on the premise that the Debtor has a statutory right to appear to be heard on all matters. *In re Porto Rican American Tobacco Co.*, 117 F.2d 599 at 601 (2d Cir. 1941); *In re McGann Mfg. Co.*, 188 F.2d 110 (3d Cir. 1951).

### FEE APPLICATION BY ATTORNEYS FOR INDENTURE TRUSTEE

The law firm of van den Berg, Gay & Burke represented ComBank, the indenture trustee in all matters involving Aldersgate since June of 1974. Initially, all services were performed by Mr. van den Berg, and subsequently by Mr. Arkin. ComBank already paid the law firm $150,542.26 for services rendered in this proceeding on behalf of the Indenture Trustee, ComBank.

The law firm billed ComBank for 2,991.08 recorded hours at the average hourly rate of $50 per hour. ComBank also was billed for $14,420 for expenses. It is agreed by ComBank and that the attorneys that $12,-657.39 of the fees and $2,002.83 of related expenses are not compensable either under the terms of the Indenture Trust or under § 242 of the Bankruptcy Act. These services relate to the efforts of ComBank to assert a pre-petition claim as a creditor and in connection with some proceedings with bank regulatory agencies.

The application submitted by counsel for ComBank includes two allowed secured claims for fees and expenses incurred in connection with the defense of actions brought against ComBank as Indenture Trustee by the Brewer interest. The law firm was successful in this action and was equally successful in defending the interest of the bondholders in adversary proceedings commenced by the Brewers in the bankruptcy court which challenged the security position of the bondholders. The civil action filed by the Brewers in the District Court sought damages against ComBank in the amount of $15 million for alleged violations of the federal securities laws and also on the ground of an alleged common law negligence. This suit was settled by ComBank by paying $2,500 without admitting liability. There was another adversary proceeding filed by the Brewers on behalf of certain Kissimmee bondholders against ComBank which was also dismissed. The bond indenture relating to the Kissimmee bonds provides for indemnification of the Indenture Trustee from the trust fund for legal fees incurred in actions against the Indenture Trustee. This Court already ruled that ComBank has a valid secured claim for reasonable fees and expenses in connection with these matters.

The law firm billed ComBank $51,734.08 and $5,166.89 for fees and disbursements respectively, but since ComBank has recovered $1,786.33 in costs from the Brewers and $17,586.03 from the title insurance company, now seeks only the balance of $34,-108.05 in fees and $3,380.56 in expenses. ComBank also seeks an allowance from the estate for services performed by the attorneys during the receivership. According to the application, the law firm spent 89⅔ hours during the receivership representing the bondholders. These services were basically rendered for the purpose of asserting ComBank's right to intervene to determine what remedies are available to the bondholders in the event Aldersgate defaults under the Indenture Trust Agreement. ComBank billed Aldersgate for services on open account which remained unpaid at the time the Chapter X petition was filed. Subsequently ComBank filed a proof of claim as an unsecured claim for those expenses on which, pursuant to the confirmed plan, received a distribution of $1,585.01 leaving $3,352.67 in fees and $21,066 in expenses which were requested to be allowed as an administrative expense. According to the application, the law firm spent 696 hours in connection with the administration of the estate, commenced actions against the estate, and sought relief from the stay and sequestration of the rents and proceeds, commenced adversary proceedings on behalf of the Englewood bondholders and actively participated in all plan hearings and hearings on proposed sales of assets. In this connection, the law firm spent 933 hours on matters connected with various reorganization plans. ComBank opposed all reorganization plans filed during 1976 and 1977, cooperated with the trustee in developing the second internal plan and actively participated in the preparation of the sale of Kissimmee; supported the Good Samaritan final offer and was instrumental in procuring an approval by the Court of the sale of the Kissimmee center to Good Samaritan. According to the time records submitted, total time spent in the Chapter X case totals 10,629 and for which the law firm requests $81,282.29 and a cost reimbursement of $7,226.77.

## FEE APPLICATION OF JOHNIE A. McLEOD, COUNSEL FOR THE BREWERS

Mr. McLeod represented the Brewer interest from September of 1974 to the

present. According to his Application, he spent 2,472.75 hours exclusive of the prosecution of the civil suit filed in the District Court and the adversary proceeding filed in the Bankruptcy Court against ComBank and the Trustee for which the Brewers already paid $170,000. Mr. McLeod seeks an allowance of $186,456.27. This represents an hourly rate of compensation of $75. Mr. McLeod was primarily involved, as noted, in representing the interest of the Brewers. The Brewers consistently took an antagonistic and hostile attitude toward the reorganization; attacked the Trustee and the Trustee's counsel; charged without basis the Trustee with "whitewash"; sought to remove the Trustee and counsel for the Trustee from the case. In addition, Mr. McLeod was intimately involved with the formulation of the Brewers' initial plan and also with the second plan submitted by the Brewers, none of which obtained an approval. Mr. McLeod was also involved with the unsuccessful efforts of the FRC to purchase the Kissimmee center and initially attempted to thwart the sale of the Kissimmee center to Good Samaritan. It is difficult from this record to conclude that any of these efforts contributed meaningfully to the reorganization or represented any measurable benefit to the estate. While Mr. McLeod maintains that he consistently urged the Court to sell the properties of the Debtor and distribute the cash to creditors, there is serious doubt as to the real extent of the McLeod contribution. For instance, Mr. McLeod did not file a formal motion or application seeking an order of sale of the assets. On the contrary, he vigorously advocated a plan based on the issuance of long-term bonds. It is equally clear that McLeod's efforts to remove the Trustee and his counsel did not contribute to the reorganization and did not represent any benefit to the estate. On the contrary, it caused unnecessary delays and substantial additional costs and expenses due to the necessity to engage special counsel to investigate these charges, none of which proved to be valid. It should be clear to anyone who is familiar with this reorganization proceeding that Mr. McLeod forcefully championed the interest of the Brewers which seldom, if ever, coincided with the interest of the estate. It is without doubt that Mr. McLeod participated in all phases of the proceeding and it may be said that some of his activities did confer some indirect benefits to the estate.

There is another problem with Mr. McLeod's application. His initial application was accompanied by the affidavit required by § 60(d) and § 249 of the Bankruptcy Act. This affidavit indicated that he intended to share his compensation with the retired New York lawyer, Mr. Ralph McDermid, who assisted him in the case. At the fee hearing, Mr. McDermid stated that Mr. McLeod agreed that whatever he got he would share the fee with him. Neither the Application nor the time summary identified the extent of Mr. McDermid's contribution to the case and when these matters came to light and Mr. McLeod was advised of a possible illegality of such an agreement, which is prohibited by § 62(d) and Bankruptcy Rule 10–215(d), he filed an amended affidavit in which he stated that he has no agreement or understanding with Mr. McDermid. The affidavit further states that any statement he made heretofore which indicates to the contrary is withdrawn and superseded. In light of this development, it appears to be proper to defer an allowance until this matter is cleared up.

## FEE APPLICATION OF JEROME J. BORNSTEIN, COUNSEL FOR THE UNOFFICIAL BONDHOLDERS ASSOCIATION

Mr. Bornstein represented an association of about 500 bondholders. He actively participated in all key hearings and was involved in the valuation, classification proceeding. He also filed a plan of reorganization on behalf of the Association which, however, was not approved, but later on he supported the sale of the Kissimmee facility to Good Samaritan.

Mr. Bornstein was retained by the Association at the agreed rate of $75 per hour. He received, so far, $16,875 for his services

rendered through December 31, 1976. Mr. Bornstein only requests an allowance of $11,250 for the 150 hours reported. The time summary submitted by Mr. Bornstein indicates that he mostly monitored the proceedings. Although he contributed to the development of the record, the only matter which he was actively involved in was an objection filed by him to the confirmation of the Trustee's second plan. In fairness, Mr. Bornstein vigorously participated in the original plan hearings, in the valuation of the assets, and assisted the Court in evaluating the soundness of the original reorganization plans. The Association's membership documents on file state that the Association and its attorneys are seeking an administrative award to reimburse the members for their contributions. However, no award can be made in the absence of an application establishing the basis of payment. Mr. Bornstein shall be granted an opportunity to amend his Application to establish the right of the members to be reimbursed for their contributions.

### FEE APPLICATION OF J. R. TRINKLE, JR., COUNSEL FOR CERTAIN BONDHOLDERS (COULTER GROUP)

Mr. Trinkle, an experienced attorney, represented a group of eleven bondholders known as the "Coulter Group" from December 3, 1975 to the present. Mr. Trinkle was actively involved in proceedings which related to the assumption of executory rent credit contracts created under the so-called "Hansen Plan" which contracts later were assumed by the Trustee. Mr. Trinkle also participated in the plan hearings and presented an appraiser whose valuation of the Kissimmee and Orange City Centers and the ultimate valuation found by the Court approximated the appraisal produced by Mr. Trinkle. Mr. Trinkle also advocated a cooperative type of plan, but this was not approved by the Court. Mr. Trinkle requests a fee of $5,000 representing his time spent in connection with the "Hansen Plan" and also in connection with the valuation hearing. The rate, according to his summary, comes to $50 per hour. He also seeks reimbursement of expenses of $275.27.

### THE CONTROLLING LEGAL PRINCIPLES

In considering the applications submitted in the reorganization proceeding, it is well to state at the outset that certain controlling legal principles which generally govern allowances in a pre-Code corporation reorganization proceeding, §§ 241–244 of Chapter X of the Bankruptcy Act of 1898 governs allowances in a proceeding under Chapter X as implemented by Bankruptcy Rule 10–215. These Sections specify the persons who may obtain an allowance for services rendered and for reimbursement of expenses in connection with the proceeding. Accordingly, allowances may be made (1) to the trustee and his counsel, attorney for the Debtor. § 241, Bankruptcy Rule 10–215(c)(1)(A); (2) to indenture trustees and attorneys or agents. § 242, Bankruptcy Rule 10–215(c)(1)(B); and (3) to attorneys for individual creditors. § 243, Bankruptcy Rule 10–215(c)(1)(B).

Court appointed officers are entitled to a reasonable compensation whether or not their services produce any benefit to the estate. *In re Food Town, Inc.*, 208 F.Supp. 139, 145 (D.Md.1962). There is no question, however, that the success of their endeavor is an extremely important factor in considering the amount to be awarded. Unlike court appointed officers, the attorney for the Debtor is only entitled to compensation to the extent the services rendered present a benefit to the estate. *In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1973). Equally, allowances to counsel or agents for the indenture trustee and attorneys for individual creditors must be based on the services rendered which produced measurable or meaningful benefit to the estate. While the Act does not define what the term "benefit" means, court decisions developed certain guidelines which, among others, include services which contributed to a plan of reorganization which has been confirmed; services which contributed to the refusal of confirmation of plans on the ground that they were un-

fair and unsound and lastly, services which were beneficial in connection with the aims of the estate in general.

■ The Court in considering the respective applications must consider each on their own merits regardless of whether or not there is an objection filed or raised. The burden of proof to establish entitlement to an allowance is, of course, on the applicant. *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 497, 85 L.Ed. 820 (1941). It is clear that the mere participation in the proceeding does not warrant an allowance. *In re Hudson & Manhattan Railroad Co.*, 224 F.Supp. 815, 839–40 (S.D.N.Y.1963), *modified on other grounds*, 339 F.2d 114 (2d Cir. 1964). In considering allowances, great care shall be exercised to avoid an allowance for duplication or multiplication of services. While the time factor is to be considered, it is clear that the time *necessarily* (emphasis supplied) spent governs the allowances rather than the time actually spent. *In re Imperial "400" National, Inc.*, 432 F.2d 232, 237 (3d Cir. 1954); *United States v. Larchwood Gardens, Inc.*, 404 F.2d 1108, 1110 (3d Cir. 1968).

■ It is a long established and recognized principle that in making allowances in cases under the Bankruptcy Act, including cases under Chapter X, the courts must be guided by the principle of strict economy. *In re First Colonial Corp. of America*, 544 F.2d 1291 at 1299–1300 (5th Cir. 1977); *In re Imperial "400" National, Inc., supra; Official Creditors' Committee of Fox Markets, Inc. v. Ely*, 337 F.2d 461, 465 (9th Cir. 1964); *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir. 1959), *cert. denied*, 361 U.S. 862, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959); *London v. Snyder*, 163 F.2d 621, 625 (8th Cir. 1947), and applicants cannot expect to be paid the rates paid in a private sector for similar services.

■ The factors which must be taken into account considering the allowances were set forth by the Fifth Circuit and other courts in a number of cases and they are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or other circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The SEC plays an important advisory role in a Chapter X case and the courts have traditionally relied on the recommendation of the SEC concerning allowances in a corporate reorganization case. *Surface Transit v. Saxe, Bacon & O'Shea, supra.* The fact of the matter is that at least in one Circuit the rule is that the recommendations submitted by the SEC should not be disregarded without definite findings and conclusions showing why this step is deemed necessary. *Finn v. Childs*, 181 F.2d 431 at 438 (2d Cir. 1950); *Scribner & Miller v. Conway*, 238 F.2d 905, 907 (2d Cir. 1956); *Securities Investor Protection Corp. v. Charisma Securities Corp.*, 506 F.2d 1191, 1196 (2d Cir. 1974); *In re Polycast Corporation*, 289 F.Supp. 712, 722 (D.Conn.1968).

Applying the foregoing legal principles to the individual applications, seriatim, this Court finds and concludes as follows:

The Estate of Mr. Reed seeks an allowance of $423,150 based on the requested fee of $50 per hour. Mr. Reed received interim payments at the rate of $1,000 per month totalling $47,500 leaving a requested balance of $375,650. The Application also seeks reimbursement of expenses totalling $10,084.26, all but $1,133.44 of which has been reimbursed. Considering the inflation factor, it is the considered opinion of this Court that Mr. Reed's annual compensation for his services shall not be more than $50,000 or a total of $200,000. He also shall be entitled, in addition, to receive a reimbursement for his expenses in full.

Mr. Colling seeks a total allowance of $886,051 which represents for a total of 10,144 hours his services rendered by Mr. Colling, his partners and his associates the following hourly rates: Average hourly rate for Mr. Colling—$100; for A. J. Stanton, Jr.—$85; for Douglas B. Beattie—$75; for Charles R. George, III—$65; and for Robert Hendren—$50. Mr. Colling's firm has already received $275,988.52 leaving a requested balance of $610,112.50. Mr. Colling also seeks a reimbursement of expenses totalling $33,334.12 all of which has already been received with the exception of $13,021.44.

In light of all the factors, it is the considered opinion of this Court that Mr. Colling shall be compensated at the rate not higher than $75 per hour. Mr. George not higher than $45 per hour and applying similar reductions to the other attorneys' compensation, Mr. Stanton not higher than $60; Mr. Beattie not higher than $55; and Mr. Hendren not higher than $35; the total allowance shall not exceed the sum of $630,000.

The Application of Don M. Stichter, counsel for the Debtor initially requested an allowance of $20,000 for 350 hours of service rendered by him to the Debtor and also by another attorney in his law firm at the rate of $57 per hour. Mr. Stichter subsequently amended his request and increased it to $27,000 for the same amount of hours spent, but the hourly rate was changed to $77 per hour based solely on the reassessment of the hourly rate. Mr. Stichter also seeks a reimbursement of expenses in the amount of $532.25 relating to travel and photo copying.

Considering the foregoing, it is the opinion of this Court that the allowance to counsel for the Debtor, Mr. Stichter, shall not be in excess of $10,000, but he shall be reimbursed in full for his expenses.

The Application of the law firm of van den Berg, Gay & Burke, counsel for the Indenture Trustee, ComBank, requests an allowance of $118,724.01 and an expense reimbursement of $10,628.99.

The law firm also seeks an allowance from the estate for their services rendered during the receivership and also in a Chapter X case. The time spent during the receivership, according to the time records, was 89⅔ hours and services related to assertion of ComBank's right to intervene, to respond to the inquiry of the bondholders and generally consult with the receiver and counsel for the receiver.

■ The law firm also seeks an allowance for services rendered to the bondholders in the receivership. While it is true that an allowance pursuant to § 242 may cover work performed prior to the commencement of the Chapter X case, the work must have a direct relationship to the reorganization. *Finn v. Childs Co., supra.* In this case, the services related to the attempt to intervene and to assert remedies in the receivership. It is this Court's opinion that these services were not sufficiently related to the reorganization of this Debtor which would warrant an allowance for these types of services. In sum, the allowance warranted in this case to ComBank shall be as follows:

|  | Fees | Expenses |
|---|---|---|
| Secured claims | $ 34,108.05 | $ 3,380.56 |
| Chapter X proceeding | 81,283.29 | 7,226.77 |
| Receivership | - - - - - | - - - - - |
| TOTAL | $115,391.34 | $10,607.33 |

Mr. McLeod, an experienced practitioner, represented the interest of the Brewers from the outset beginning September of 1974. According to the time records submitted, Mr. McLeod spent 2,472.75 hours in performing these services exclusive of the prosecution of the civil suit filed against ComBank and the trustee in the District Court and the adversary proceeding filed in the Bankruptcy Court litigation mentioned earlier for which the Brewers paid Mr. McLeod approximately $170,000 already. Mr. McLeod seeks additional allowance of $186,456.27. This allowance is based on a $75 per hour rate. Although Mr. McLeod

also sought a reimbursement of expenses, he withdrew this request at the fee hearing.

Considering the applicable legal principles, it is the considered opinion of this Court that the maximum allowance to Mr. McLeod shall not exceed $10,000, after his association with Mr. McDermid is clarified and after the matter of the December 12, 1980 agreement is resolved.

The allowance to Mr. Bornstein for the period covered by his application concerning the nature and extent of his services shall be $5,000, but he may also be allowed some additional allowance for his services rendered earlier in the case in connection with valuation of the assets and in connection with his participation in the plan hearings. Mr. Bornstein is given an opportunity to amend his application to cover this earlier period if he is so deemed to be advised.

Mr. Trinkle represented the Coulter Group and submitted a plan which was not approved and also participated in the resolution of the so-called "Hansen Plan" which related to certain contracts which were assumed later by the Trustee. Mr. Trinkle also participated in the valuation hearing and the appraiser presented by him did contribute to the resolution of the question. Mr. Trinkle's allowance shall be $2,500 and his expense reimbursement shall be $275.27.

The Trustee shall submit a separate order of allowance in accordance with the foregoing.