In re CONSOLIDATED BANCSHARES, INC. d/b/a Consolidated Investors Inc., Debtor.

Bankruptcy No. 182–00094.

United States Bankruptcy Court, N.D. Texas, Abilene Division.

May 9, 1985.

---

Rufus Garrett, Garrett & Settle, Fort Worth, Tex., for Objecting Shareholders.

John B. Atwood, III, Creel & Atwood, Dallas, Tex., Jack Bryant, Abilene, Tex., for debtor.

Andrea Nation, U.S. Trustee's Office, Dallas, Tex., for the U.S. trustee.

Lawrence Beason, Dallas, Tex., for the Official Equity Shareholders Committee.

Alan Leibel, Brice & Barron, Dallas, Tex., for Mercantile Texas Corp.

## MEMORANDUM OPINION REGARDING APPLICATIONS FOR COMPENSATION

MICHAEL A. McCONNELL, Bankruptcy Judge.

On March 11, 1985, the Court held an evidentiary hearing on various applications for the allowance of fees filed by the attorneys for the Debtor, its accountants, official committees and individual creditors. Following the hearing, the Court entered a series of orders on March 13, 1985 awarding compensation to certain of the professionals seeking fees and denying it as to others. Appeals have been taken to the District Court regarding these orders, and the purpose of this Memorandum Opinion is to supplement the Court's findings and conclusions as set forth in the March 13, 1985 orders.[1]

### CASE HISTORY

The Debtor, Consolidated Bancshares, Inc., was organized in January of 1980 under the laws of the State of Texas as a bank holding company to hold the stock of the Abilene National Bank. At the time of the Debtor's formation, the majority stock interests in the Debtor were held by the "Consolidated Bancshares Voting Trust" which was under the control of Mr. Don Earney, Trustee.

After the Debtor's formation, it also became engaged in the mortgage, insurance and computer leasing business; and by 1982 the Debtor was in the initial stages of adding several additional banks to its bank holding group located primarily in central and west Texas.

In the summer of 1982, the Debtor and Abilene National Bank came under intense scrutiny from the Comptroller of the Currency and other bank regulatory agencies concerning its current financial condition and prospects for the future after being particularly hard-hit by the rapid decline in

1. The three appeals have been consolidated by Order of this Court entered on April 16, 1985.

the oil boom as chronicled in articles in the Dallas Morning News.

Following a continuing series of bank examinations, the federal agencies with regulatory powers over the Abilene National Bank made a demand for additional capital to be raised in a matter of days in the approximate sum of $30,000,000. The principals of the Debtor immediately arranged for new capital to be raised in the amount of approximately $16,000,000 and asked for additional time from the regulatory agencies for financing the balance of the additional capital needs of the Abilene National Bank.

The regulatory agencies, however, were unwilling to grant additional time; and the Abilene National Bank was presented with an ultimatum on August 5, 1982 from the agencies of either having the bank closed immediately and taken over by the federal agencies, or having the ownership of the Abilene National Bank transferred to Mercantile Texas Corporation ("Mercantile") in satisfaction of a note. Recognizing the severe inconvenience and adverse consequences that would be suffered by the shareholders and depositors in the event the bank was closed by the federal regulatory agencies, the Debtor and Abilene National Bank reluctantly decided to effectuate the transfer of the ownership of the Abilene National Bank to Mercantile; and, on August 5, 1982, the Board of Directors consented to the proposal of Mercantile to retain the Debtor's stock interest in the Abilene National Bank in lieu of foreclosure and in satisfaction of a $9,200,000 note.

The shareholders of the Debtor, however, were far from unanimous in their support of the actions of the Board of Directors; and a group of shareholders filed suit in the 104th Judicial District Court of Taylor County, Texas on September 7, 1982 challenging the validity of the transfer of the ownership of the Abilene National Bank to Mercantile. The suit was styled *"Henry A. Grubbs, et al. v. Consolidated Bancshares, Inc."*, and was brought as a shareholders derivative action pursuant to Article 5.14 of the Texas Business Corporation Act seeking a judicial declaration that the transfer to Mercantile was in violation of Article 5.10 of the Texas Business Corporation Act. The suit was later transferred to the 116th Judicial District Court of Dallas County, Texas on a plea of privilege. After the instant bankruptcy proceeding was filed, the suit was removed to this Court by the Debtor and assigned Adversary No. 485–4020.

Following the transfer to Mercantile, the officers of the Debtor also began to doubt the wisdom of their decision and engaged in a review of what rights, if any, accrued to the Debtor as a result of the actions of August, 1982. After investigation, the Debtor concluded that its best course of action was to seek relief under Chapter 11 of the Bankruptcy Code and to file an action for damages against Mercantile. The instant bankruptcy proceeding was then filed on December 3, 1982.

Immediately upon the filing of the Chapter 11 proceeding, the Debtor filed Adversary Proceeding No. 182–0063, *"Consolidated Bancshares, Inc., Debtor-In-Possession v. Mercantile Texas Corporation"*, in this Court seeking $56,249,202 in damages from Mercantile on the basis of a fraudulent conveyance theory. The case was subsequently removed to the District Court on January 23, 1984 where it was designated "Misc. Bankruptcy No. 1–84–1–M" and assigned to the docket of the Honorable Halbert O. Woodward.

Additional litigation was soon forthcoming as relations between the Debtor and Mercantile continued to deteriorate. In the summer after institution of the Chapter 11 proceeding, Mercantile attempted to foreclose upon certain stock of the Debtor which had been pledged by some individual shareholders to secure loans. The banks likewise attempted to foreclose against stock of the Consolidated Bancshares Voting Trust. As a consequence of this attempt by Mercantile, the Debtor filed an injunction action in this Court, Adversary No. 183–0054, *"Consolidated Bancshares, Inc. v. Mercantile Texas Corporation"*,

seeking to enjoin and restrain the attempted foreclosures. The Debtor was successful in obtaining an injunction from the Honorable John Flowers, former judge of this Court, on August 10, 1983 and the order was appealed by Mercantile to the District Court. On appeal, the case was designated "Misc. Bankruptcy No. 1–84–2–K" and assigned to the docket of the Honorable David O. Belew, Jr.

Several attempts were then made to settle the three pending suits with Mercantile, but no progress was made. However, after the Court ruled on various jurisdictional matters in early 1984 and the Court entered certain orders regarding motions of Litton Industries Credit Corporation and Nashville City Bank and Trust Company, the Debtor and Mercantile renewed discussions regarding the possibility of settlement of the adversary proceedings.

By the fall of 1984, settlement negotiations had progressed to the point that the Debtor was able to file a plan of reorganization incorporating the terms of a proposed global settlement agreement with Mercantile regarding all three suits. The plan was proposed in conformity with Section 1123(b)(3) of the Bankruptcy Code which expressly states that a "plan of reorganization" may provide for the settlement or adjustment of any claim belonging to the debtor or the estate.

The Plan of Reorganization provided that all creditor claims would be satisifed in full and that the shareholders of the Debtor would receive benefits from a settlement fund, which initially totaled some $5,400,-000.00. The Plan further provided that the three pending suits would be dismissed with prejudice and that any officer or director of the Debtor that had asserted or might assert an indemnity claim against the Debtor would release such claim and the Debtor would likewise release any claim that it might have against such person.

A Disclosure Statement regarding the proposed Plan of Reorganization was subsequently approved by the Court and a confirmation hearing was set for January 30, 1985. A dissenting group of equity shareholders led by Henry Grubbs (plaintiff in the shareholder derivative suit) promptly filed a multi-faceted objection to confirmation including a challenge to the court's authority to "settle" their claims over their objections. After considering the objections in light of the record developed at the hearing, the Court approved the settlement agreement with Mercantile and entered an order immediately after the hearing confirming the Plan of Reorganization. After the Order of Confirmation became final, orders of dismissal were then entered in each of the three pending suits.

## THE APPLICATIONS FOR COMPENSATION

After confirmation of the Plan of Reorganization, various attorneys and accountants filed their applications for fees to be paid from the estate pursuant to Sections 503 and 330 of the Bankruptcy Code. A hearing was set for March 11, 1985 and notice of the hearing was sent to certain parties specified by Rule 2002 of the Bankruptcy Rules.

The following parties made applications to the Court for compensation and reimbursement of expenses in the amounts listed below:

| | | |
|---|---|---|
| Creel & Atwood | Fee | $306,131.00 |
| Attorneys for Debtor and Debtor-In-Possession | Expenses | $ 5,364.49 |
| Jack Bryant | Fee | $148,356.00 |
| Attorney for Debtor and Debtor-In-Possession | Expenses | $ 3,469.91 |
| Richard Hewitt | Fee | $ 48,586.50 |
| Special Counsel to Debtor and Debtor-In-Possession | Expenses | $ 3,129.15 |
| Lawrence Beason | Fee | $ 14,626.50 |
| Attorney for Equity Shareholders' Committee | Expenses | $ 358.78 |
| Gibson, Johnson and Company, Accountants for Debtor and Debtor-In-Possession | Fee | $ 20,461.95 |
| | Expenses | $ –0– |

| Garrett & Settle[2] | Fee | $ 30,000.00 |
|---|---|---|
| Attorneys for Henry Grubbs, et al | Expenses | $ 187.79 |
| Ray & Terrell | Fee | $ 48,840.00 |
| Attorneys for Henry Grubbs, et al | Expenses | $ 1,196.21 |
| Pierson & Galyen | Fee | $183,107.50 |
| Attorneys for Henry Grubbs, et al | Expenses | $ 6,461.85 |

The U.S. Trustee for the Northern District of Texas then filed an objection to the payment of any fees by way of a "bonus" or "contingency fee" to Creel & Atwood or Jack Bryant. The U.S. Trustee further objected to the payment of *any* fees to the attorneys for the Grubbs group claiming such fees represented a duplication of effort on the part of the attorneys involved; that the services rendered were of no benefit to the estate; and that this case presented no need for a private "attorney general". Similar objections were filed by the attorneys for the Grubbs group against the fee applications of Creel & Atwood and Jack Bryant, and by Creel & Atwood and the Official Shareholders Committee against the fee request of the Grubbs group. No objections were filed to the fee applications of Richard Hewitt, Lawrence Beason or Gibson, Johnson & Co.

## THE APPLICABLE LAW

Section 330 of the Bankruptcy Code provides:

(a) After notice and a hearing, and subject to Sections 326, 328 and 329 of this title, the Court may award to a trustee, to an examiner, *to a professional person employed under Section 327 or 1103 of this title, or to the Debtor's attorney —*

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of compara-

ble services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses. (emphasis ours).

This Court, in considering the amount of attorney's fees to be awarded a debtor in a bankruptcy case is guided by the case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), as made applicable to bankruptcy cases by *In the Matter of First Colonial Corporation of America*, 544 F.2d 1291 (5th Cir.1977), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). The Fifth Circuit in *Johnson* set forth twelve factors that this Court must consider in making an award of attorney's fees. The factors enumerated in the *Johnson* case are as follows:

1. The time and labor required.

2. The novelty and difficulty of the questions.

3. The skill requisite to perform the legal services properly.

4. The preclusion of other employment by the attorney due to acceptance of the case.

5. The customary fee.

6. Whether the fee is fixed or contingent.

7. Time limitations imposed by the client or the circumstances.

8. The amount involved and the results obtained.

9. The experience, reputation and ability of the attorneys.

10. The undesirability of the case.

11. The nature and length of the professional relationship with the client.

12. Awards in similar cases.

The *Johnson* analysis was further refined by Judge Wisdom in *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir.1980). Judge Wisdom's discussion was condensed and re-stated in *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087,

---

**2.** Applicant attorneys for Henry Grubbs, et al ("the Grubbs group") have requested that the

total fees allowed to all such applicants should not exceed $231,947.50.

1092–1093 (5th Cir.1982) where Judge Rubin commented as follows:

> Of the twelve *Johnson* factors, Judge Wisdom stated that recent Fifth Circuit decisions suggested that four of the factors deserve "special heed": "(1) the time and labor involved, (5) the customary fee, (8) the amount involved and the results obtained, and (9) the experience, reputation, and ability of counsel." Id. at 583. These factors should be considered in the following framework:
>
> (1) Ascertain the nature and extent of the services supplied by the attorney;
>
> (2) Value the services according to the customary fee and quality of the legal work; and
>
> (3) Adjust the compensation on the basis of the other *Johnson* factors that may be of significance in the particular case.
>
> Id. (relying on *First Colonial,* 544 F.2d at 1299–1300). *Johnson,* thus interpreted, adopts a standard much like the lodestar method of the Second, Third, and District of Columbia Circuits. The "lodestar" is equal to the number of hours reasonably expended multiplied by the prevailing hourly rate in the community for similar work. The lodestar is then adjusted to reflect other factors such as the contingent nature of the suit and the quality of representation.

In view of the admonition of the Fifth Circuit in *First Colonial* that the bankruptcy judge must briefly explain the findings and reasons upon which the award is based, including an indication of how each of the factors listed in *Johnson* affected his decision, the Court's discussion will now focus on the fee applications of Creel & Atwood and Jack Bryant as co-counsel for the Debtor.

As mentioned earlier, Creel & Atwood seeks compensation in the amount of $306,-131.00 and expenses in the amount of $5,364.49. Jack Bryant, co-counsel for the Debtor also seeks compensation in the amount of $148,356.00 and expenses of $3,469.91. Applying the criteria set forth in *Johnson* (as further refined by *Copper Liquor, Inc.*) to their fee applications, the Court finds as follows:

1. *The Time and Labor Required.* The applicants have submitted detailed fee applications in conformity with Rule 2016 of the Bankruptcy Rules. These applications together with the time records of Creel & Atwood and Jack Bryant admitted into evidence at the March 11th hearing are sufficient both in detail and extent to inform the Court as to the nature and extent of these services. The applicants' combined time is:

| | |
|---|---|
| Creel & Atwood | 1,539.7 hours |
| Jack Bryant | 200.9 hours |
| TOTAL | 1,740.6 hours |

The Court has no quarrel with applicant's assertion that the hours expended were reasonable and necessary under the circumstances. In this connection the Court recognizes that it is almost impossible to "second guess" the proper amount of time that counsel should have spent on a particular matter. This difficulty was recognized by a panel of the First Circuit in *Gabriele v. Southworth,* 712 F.2d 1505 (1st Cir.1983) where it commented:

> "One opposing, for example, the reasonableness of time spent in one or more phases of a litigation can go just so far in raising questions. Only rarely will he be able to demonstrate vividly that an issue was illusory, irrelevant or frivolous or that too many facts and transcript references had been marshaled. This inability to "prove" a point does not relieve the judge from drawing on his own experience and wisdom and deciding whether the time spent on each phase was in excess of a reasonable amount. Nor should the judge become so deluged with details that he is unable to view the claims for fees in perspective. He must retain a sense of overall proportion."

2. *The Customary Fee.* A "customary" fee on an hourly basis for work in this area for senior partners specializing in bankruptcy and debtor/creditor relations would be approximately $125.00–$175.00 per hour.

3. *The Amount Involved and the Results Obtained.* The results obtained in this case were exceptional. All creditor claims will be satisfied in full from the settlement fund allowing an additional distribution of funds to the equity shareholders in this case. In the event of a liquidation such satisfaction was far from assured. It is reasonably estimated that such cash and credits to the shareholders will be not less than $1.80 per share for the 2,161,837 shares resulting in a total cash and credit fund available to the equity shareholders in the sum of approximately $3,891,306.60. This sum will be disbursed or credited to the equity shareholders after claims of unsecured creditors in the total amount of $1,987,884.84 have been satisfied.

4. *The Experience, Reputation and Ability of the Attorneys.* Ed Creel, John Atwood and Jack Bryant are highly regarded practitioners. The senior partners of Creel & Atwood have been engaged in the practice of bankruptcy law for a period in excess of 17 years. Both senior partners have considerable experience as attorneys for receivers, trustees, debtors, creditors, creditors' committees and both have served as trustee and receivers for bankruptcy courts. Jack Bryant has been engaged in the practice of law for approximately 35 years in Abilene, Texas. During that time, Bryant has appeared as counsel for the debtor in approximately 150 cases under the provisions of the Bankruptcy Act and the Bankruptcy Code. In addition, Bryant maintains at all times active files on civil business litigation involving approximately 50 active contested matters.

In addition to the foregoing factors deserving "special heed", two additional *Johnson* factors are of special significance in this case: (1) the nature and length of the professional relationship with the client or its principals; and (2) whether the fee is fixed or contingent.

### The Nature and Length of the Professional Relationship With the Client

Applicants had no prior relationship with the Debtor and therefore this factor has little relationship to consideration of the fee in this case. With regard to prior relationships with officers and directors of the Debtor, however, the attorneys for the Grubbs shareholder group alleged that Jack Bryant had represented certain officers of the bank prior to the bankruptcy filing and therefore had a conflict of interest in representing the Debtor as co-counsel. Although there is support for the denial of fees in cases where there is a true conflict, *see, e.g., In Re Futuronics Corporation,* 655 F.2d 463 (2nd Cir.1981); *In Re Philadelphia Athletic Club, Inc.,* 38 B.R. 882 (Bankr.E.D.Pa.1984), the Court finds that the facts concerning Mr. Bryant's representation of former officers and directors of the Debtor were fully developed at the March 11th hearing and were not of such a nature as to deny payment to him of any fees. (Tr. 54–65).[3]

### The Requested "Contingency" Fee

This case has an unusual blush in that the initial fee agreement between the Debtor and its attorneys was on an hourly fee basis plus a "contingency fee". The parties had agreed that the hourly rate for Mr. Creel and Mr. Atwood would be $175.00 while that for associate attorneys would be $135.00. In addition, the parties provided that the "lawyer group" should receive five percent of the net amount of any recovery either by trial, settlement or otherwise as a contingency fee. To this end, the applicants have requested an additional $112,504.53.

The applicants realize, appropriately, that this Court is not bound by any contingent fee arrangement which the parties have agreed to among themselves. Although there is nothing inherent in a contingency fee agreement between a debtor

---

**3.** References to the Transcript of the March 11, 1985 Hearing on Fee Applications will be made by use of the designation Tr. "(p.)".

and its attorney which prevents it from being enforceable in bankruptcy, *Yermakov v. Fitzsimmons (In Re Yermakov)*, 718 F.2d 1465, 1469–1470 (9th Cir.1983), Section 330(a)(1) clearly restricts a fee award to only "reasonable compensation for *actual, necessary services* ". In *Yermakov*, a panel of the Ninth Circuit commented on the inherent contradiction of a contingency fee award for *actual* services:

> "To recover under the contingency fee contract, the appellees filed for compensation under 11 U.S.C. § 330(a)(1), which permits a fee award only for "reasonable compensation for actual, necessary services rendered by" an attorney. *The appellees ignore the purpose and effect of that provision.* Section 330 is designed to secure for the estate the services of competent professional persons, including a trustee, an attorney for the trustee, accountants, appraisers, and others who may be needed in order best to operate, reorganize, or liquidate the estate. [citations omitted]. The debtor's attorney is included among the professionals compensated under section 330 on the theory that his services, while not performed for the direct benefit of the estate, may be helpful to the bankruptcy process because they facilitate orderly administration of the estate. 2 Collier on Bankruptcy ¶ 330.04[3] (1983 ed.). Because "economy in administration is the basic objective," . . . limits the compensation payable to the debtor's attorney as well as other professionals to a reasonable amount for "actual" services that are "necessary" in connection with the bankruptcy process. *The contingent nature of the appellees' claim itself belies any contention that the amount appellees seek is reasonable compensation for actual or necessary services.*" (emphasis ours)

This Court is of the opinion that an hourly fee for actual, necessary services clearly constitutes reasonable compensation and that any contingency award in excess of this amount would be unjustified. The Court agrees with the statement made by the court in *In Re Citizens Mortgage Inv. Trust (CMIT)*, 37 B.R. 813, 820 (Bankr. D.Mass.1984) where the Court said:

> "Since competency is expected, a high level of expertise in a complicated reorganization case does not automatically warrant a bonus. *See Southwestern Media, Inc. v. Rau,* 708 F.2d 419, 428 (9th Cir.1983); *Matter of Aldersgate Foundation, Inc.,* 10 B.R. 910, 915 (Bankr.M.D. Fla.1981). Thus, a fair and reasonable award "presupposes a high level of special skill." *In Re Continental Mortgage Investors,* Slip Opinion Number 76–593–S (D.Mass. December 1, 1983)." [4]

Having found the above facts and having adjusted the compensation on the basis of other *Johnson* factors of significance in this case, the Court finds that reasonable compensation for the senior partners of the firm of Creel & Atwood would be the sum of $224,226.00. Reasonable compensation for Jack Bryant would be the sum of $36,906.00. This award represents an hourly rate for Jack Bryant, John B. Atwood and L.E. Creel of $175.00 per hour. This hourly fee—$175.00 per hour—is awarded only to the most abled and skilled bankruptcy practitioners in successful cases in this area. Under the circumstances of this case, this Court finds that the high hourly rate of $175.00 per hour adequately compensates the applicants according to their skill, the novelty and difficulty of the questions they addressed, and their experience, reputation and ability.[5]

In making this award of compensation, the Court has also awarded an hourly rate

---

**4.** *See also, In Re Humbert,* 39 B.R. 643 (N.D. Ohio 1984). Acting as attorney for himself, the trustee asserted that he was entitled to ⅓ of a $111,805 recovery even though he had spent only 36 hours on the case. The district court noted that Section 328(a) permits alteration of a fee arrangement and affirmed the bankruptcy court allowance of $7,500.00.

**5.** To the extent applicants seek a "bonus" or "enhanced fee", *see e.g. Rose Pass Mines v. Howard,* 615 F.2d 1088 (5th Cir.1980), the foregoing discussion is equally applicable.

of $135.00 an hour for the work done by other attorneys in the Creel & Atwood firm and $30.00 an hour for work done by paralegals. These are the hourly rates requested by the applicants and, again, the Court finds the fees to be reasonable under the circumstances.

## THE FEE APPLICATIONS OF THE GRUBBS GROUP FOR "SUBSTANTIAL CONTRIBUTION" TO THE ESTATE

■ The Court's inquiry next turns to the fee applications of Ray & Terrell and Pierson & Gaylen, attorneys for the Grubbs group of shareholders. At the outset, the Court notes that these fee applications are brought pursuant to Section 503(b)(3)(D) which provides in pertinent part:

(b) after notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under Section 502(f) of this title, including—

(3) the actual necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under Section 1102 of this title, in making a *substantial contribution* in a case under Chapter 9 or 11 of this title; or ... (emphasis ours)

According to the legislative history concerning the enactment of Section 503, the phrase "substantial contribution" is derived from Sections 242 and 243 of the former Bankruptcy Act. It does not require a contribution that leads to confirmation of a plan, for in many cases it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation such as fraud in connection with the case. H.R. No. 95–595, 95th

Cong., 1st Sess. 355 (1977); See S. No. 95–989, 95th Cong., 2d Sess. 66–67 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; 3 COLLIER ON BANKRUPTCY 503.04[3][d] at 503–31; *In Re Farm Bureau Services, Inc.,* 32 B.R. 69, 71 (Bankr. E.D.Mich.1982).[6]

"The policy aim of authorization of such compensation is to promote meaningful creditor participation in the reorganization process." *In Re Richton Intern. Corp.,* 15 B.R. 854, 855–56 (Bankr.S.D.N.Y.1981); *In Re Interstate Stores, Inc.,* 1 B.R. 755, 757 (Bankr.S.D.N.Y.1980). Concomitant with the aim of creditor participation is the authorization of compensation for counsel to creditors. *See, National City Bank v. Saldana Crosas Realty Corp.,* 86 F.2d 923 (1st Cir.1936). The appropriate test of compensable services is whether they substantially contributed to the successful result.

Applications of this nature should be the subject of close scrutiny by the court. As noted by Judge Frederick A. Johnson in *In Re Saroca Corporation,* 46 B.R. 533, 12 BCD 962, 963 (Bankr.D.Maine 1985):

"Applicants for allowance of administrative expenses under section 503(b)(3)(D) and (4) must be carefully scrutinized. Such applications are filed after the fact, that is, after the services have been performed or the expenses have been incurred, and without prior approval, and in many instances, without the court's knowledge. In the case of requests for compensation for professional services, such services are rendered without the employment of such persons having been approved by the court as is usually the case."

Applicants, Donald Ray and the firm of Pierson & Galyen, seek an allowance of fees from this estate for their services rendered in prosecuting the Grubbs shareholder's derivative suit which was filed prior to

---

**6.** The term "substantial contribution" has been analyzed in several decisions, but the courts as a whole simply restate the definition found in the legislative history. *See, e.g., In Re Calumet Realty Co.,* 34 B.R. 922, 925–926 (Bankr.E.D.Pa.

1983); *In Re Seatrain Lines, Inc.,* 21 B.R. 194, 195 (Bankr.S.D.N.Y.1982); *In Re UNR Industries, Inc.,* 736 F.2d 1136, 1139 (7th Cir.1984); *In Re United Puerto Rican Food Corp.,* 41 B.R. 565 (Bankr.E.D.N.Y.1984).

the inception of these bankruptcy proceedings and "settled" by the confirmed plan of reorganization. Applicants contend that they are entitled to recover attorney's fees even though the suit was not pursued to judgment, citing *Modern Optics, Inc. v. Buck*, 336 S.W.2d 857 (Tex.Civ.App.—Waco 1960), writ ref'd n.r.e.); or, in the alternative, that as a matter of equity their fees should be paid out of the Mercantile settlement fund generated in part by settlement of the shareholder's derivative suit.

The facts concerning the activities of the attorneys for the Grubbs shareholder group were fully developed at the March 11th hearing. Grey Pierson, one of the applicant attorneys for the Grubbs group, testified that his grandfather, Henry H. Grubbs, and his father, Don Pierson, founded the Abilene National Bank in 1963. Although they sold most of their interests in 1967, they continued to retain substantial shareholdings in the bank. (Tr. 85) Accordingly, Pierson and his family followed the events of the summer of 1982 with special interest as they began to unfold in the press.

Following the surprise announcement of the takeover of Abilene National Bank by Mercantile on August 6, 1982, Pierson attended a shareholders meeting in Abilene which was called for the purpose of explaining the actions of the Board of Directors. Pierson then reported to his family the statements made by the bank management at the meeting.

His uncle, Henry A. Grubbs, however, was dissatisfied with the explanation given at the shareholder's meeting, and therefore authorized Pierson to initiate a shareholder's derivative action against Mercantile to attempt to set aside the transfer to Mercantile. (Tr. 86–89).

The suit was filed on September 7, 1982 in the 104th Judicial District Court of Taylor County, Texas (approximately one month after the Mercantile takeover) alleging the transfer was a violation of the provisions of Article 5.10 of the Texas Business Corporation Act which requires special authorization of shareholders for the disposition of certain assets. Mercantile immediately filed various motions contesting the jurisdiction of the state district court as well as a plea of privilege seeking to have the case transferred to Dallas County. On October 3, 1983, the plea of privilege was sustained and the case was transferred to Dallas County. An appeal of the order sustaining the plea of privilege was then taken to the Court of Civil Appeals.

After the appeal was taken, the case remained inactive for approximately one year until it was removed to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division on November 1, 1984. The case was subsequently transferred to the docket of this Court.

Applicants maintain that they have spent approximately 1,727.25 hours in reasonable and necessary services concerning the shareholder's derivative suit and seek total fees from the estate in the amount of $231,947.50. This Court, however, in reviewing the participation of the attorneys for the Grubbs shareholder group cannot find that their actions made a "substantial contribution" to the proceeding. In this regard, the Court notes that at the inception of this case an equity shareholder's committee was formed to represent the interests of *all shareholders* including the Grubbs group and this committee retained able counsel with the express approval of this Court. Therefore any work performed by the attorneys for the Grubbs shareholder group after the formation of the equity shareholder group has resulted in a needless duplication of time and effort. Furthermore, this Court notes that the attorneys for the Grubbs shareholder group neither sought nor received authorization by this Court to act as special counsel for the equity shareholders committee.

Moreover, once the bankruptcy proceeding was initiated by the Debtor in December 1983, the Grubbs shareholder derivative suit became property of the estate to be prosecuted by the Debtor unless abandoned. Under similar circumstances, shareholders derivative actions have been

dismissed. See, *e.g., Mitchell Excavators by Mitchell v. Mitchell,* 734 F.2d 129 (2nd Cir.1984); *In Re Mortgage America Corp.,* 714 F.2d 1266 (5th Cir.1983); *Matter of Daniele Laundries, Inc.,* 40 B.R. 404 (Bankr.S.D.N.Y.1984).

In conclusion, this Court has a special responsibility to the creditors of bankruptcy estates when reviewing fee applications. Obviously, each dollar awarded to the attorneys and accountants is one less dollar available for payment to creditors and shareholders. As recognized in *First Colonial, supra* at 1297, it is the duty of the bankruptcy court to "exercise its discretion for the double purpose of fairly treating the trustee and his counsel while at the same time doing equity to the debtor and creditors." In this case, the Court took extensive evidence and has applied the ·clear standards of *Johnson* and *First Colonial* to the. facts.

Accordingly, the Court finds and concludes as a matter of fact and law that the objection of the U.S. Trustee should be sustained in its entirety and that the various fee applications should be allowed in the following amounts:

1. Creel & Atwood Attorneys for Debtor and Debtor-in-Possession — Fee $224,226.00 — Expenses $ 5,364.49 (less fees and expenses already paid)

2. Jack Bryant Attorney for Debtor and Debtor-in-Possession — Fee $ 36,906.50 — Expenses $ 3,469.91 (less fees and expenses already paid)

3. Richard Hewitt Special Counsel to Debtor and Debtor-in-Possession — Fee $ 48,586.50 — Expenses $ 3,129.15

4. Lawrence Beason Attorney for Equity Shareholders' Committee — Fee $ 14,626.50 — Expenses $ 358.78

5. Gibson, Johnson and Company, Accountants for Debtor and Debtor-in-Possession — Fee $ 20,461.95 — Expenses $ –0–

6. Garrett & Settle Attorneys for Henry Grubbs, et al — Fee $ –0–

7. Ray & Terrell Attorneys for Henry Grubbs, et al — Fee $ –0–

8. Pierson & Galyen Attorneys for Henry Grubbs, et al — Fee $ –0–