**In re CASCO BAY LINES, INC., Debtor.**

**Appeal of Richard E. POULOS.**

**Bankruptcy No. 82–9017.**

United States Bankruptcy Appellate Panel
for the First Circuit.

Dec. 23, 1982.

P. Benjamin Zuckerman, Portland, Maine, with whom David C. Hillman and Robert J. Keach, Portland, Maine, were on brief, for appellant.

Before LAWLESS, C.J., and GLENNON and VOTOLATO,* JJ.

LAWLESS, Chief Judge.

Before the Panel is the appeal of Richard E. Poulos (Poulos), counsel for the debtor in possession and debtor Casco Bay Lines, Inc. (CBL), from the final fee allowance made by the bankruptcy judge.[1] Poulos, contending the fee was inadequate, argues that the bankruptcy judge abused his discretion in

---

* Judge Votolato did not participate in this decision.

1. The third bankruptcy judge involved in these proceedings (hereinafter referred to as the "bankruptcy judge") following Judge Cyr's departure and Judge Johnson's recusal.

four separate respects. First, Poulos contends that the bankruptcy judge's denial of the motion for recusal at the fee hearing was an abuse of discretion. Additionally, Poulos argues that the bankruptcy judge abused his discretion in determining the fee in that he: (1) failed to apply the proper legal standard; (2) applied the proper legal standard in an improper manner; and (3) based the award on clearly erroneous findings of fact. *See Matter of First Colonial Corp. of America,* 544 F.2d 1291, 1298 (5th Cir.1977) *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

We hold that the bankruptcy judge did not abuse his discretion by denying the motion for recusal because appellant merely renewed a motion that had been denied earlier in the case and affirmed by this Panel in 17 B.R. 946 (Bkrtcy. 1st Cir.1982) and 28 U.S.C. § 455 applies only to conduct which runs against a party and not the lawyer. We hold that the bankruptcy judge did abuse his discretion by failing to apply the proper legal standard in the appropriate manner as set forth in *Furtado v. Bishop,* 635 F.2d 915 (1st Cir.1980). Since an appellate court is itself an expert on fees and has the authority to make appropriate fee allowances, in view of the peculiar circumstances of the case (as will appear) and in the interests of judicial economy we have done so.

**2.** For further background on these proceedings, see, *inter alia* 8 B.R. 784 (Bkrtcy.App. 1st Cir. 1981) [Appeal of Maine Public Utilities Commission (PUC) from Order (Cyr, J.) denying its motion to dismiss a complaint filed against it by CBL]; 14 B.R. 18 (Bkrtcy.App. 1st Cir.1981) [Appeal of City of Portland from Order (Cyr, J.) imposing certain limitations upon the Intervenor status of Portland]; 14 B.R. 846 (Bkrtcy. App. 1st Cir.1981) [Appeal of City of Portland from Order (Cyr, J.) denying Portland's motion to disqualify Poulos as CBL's counsel]; No. 81, slip op. (Bankr. 1st Cir. November 6, 1981) [Emergency appeal of CBL and Poulos from Order establishing hearing date on Casco Bay Island Transit District's (CBITD) Motion to strike appearance and disallow all compensation to Poulos]; No. 81, slip op. (Bankr. 1st Cir. December 22, 1981) [Appeal of CBL from Order granting CBITD party-in-interest status]; 15 B.R. 298 (Bkrtcy.App. 1st Cir.1981) [Appeal of

## FACTS

This Panel is not a stranger to the reorganization efforts of CBL and the related individual Chapter 11 proceedings of its shareholders, Peter and Valerie Kontaratos, as we have had occasion to review many aspects of these cases since they were initiated in June, 1980.[2] Rather than engaging in an extended analysis of all the trial and appellate proceedings to date, a brief summary of some of the significant Chapter 11 events provides a useful back-drop to an understanding of the matter at hand.

On June 12, 1980, CBL, by its attorney, Poulos, filed its original petition for relief under Chapter 11 of the Bankruptcy Code. CBL is a steamship line which, among other things, provides commuter service between the City of Portland, Maine and various islands in that city's harbor. In some instances, it is the sole form of ready transit between certain islands and the mainland. As such, CBL is regulated by public authority and is of interest to the local citizenry which it serves. CBL, however, is a privately owned corporation; its principal stockholders, directors and officers being Valerie and Peter Kontaratos. CBL's Chapter 11 filing was, in part, connected with the financial problems of its principals, who had appropriated and wrongfully used corporate assets for their individual benefit. They, in turn, filed individual Chapter 11 petitions on June 13, 1980, through their attorney Poulos.[3]

United States Trustee from Order (Cyr, J.) requiring the U.S.T. to investigate the qualifications of the Kontaratoes' Creditors' Committee]; 17 B.R. 946 (Bkrtcy.App. 1st Cir.1982) [Appeal of CBL from Order authorizing the appointment of a Chapter 11 trustee and denying CBL's motion for recusal of the bankruptcy judge.]

**3.** Poulos did so in reliance upon Maine Bar Rule 3.4, which provides:

(d) *Multiple Employment Permitted.* A lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of the lawyer's independent professional judgment on behalf of each.

On or about June 12 or 13, 1980, CBL filed an application for authority to employ Poulos as its attorney during the Chapter 11 case; Poulos filed an affidavit of his representation of adverse interests and disclosed his representation of the Kontaratoses; the Bankruptcy Court [Cyr, J.] authorized CBL's retention of Poulos as debtor's counsel. Upon similar application and disclosure, the Bankruptcy Court authorized the Kontaratoses' retention of Poulos as their attorney during their Chapter 11 case.

Although the misappropriation of corporate assets by the Kontaratoses was fully disclosed to CBL's creditor body and to the bankruptcy court and the Kontaratoses orally agreed to waive their discharge with respect to their obligation to repay said monies to CBL, in face of mounting opposition, Poulos withdrew from his representation of the Kontaratoses with court approval on October 23, 1980.[4] On that date, the bankrupty court (Cyr, J.) barred the Kontaratoses from any participation in or control of the management of the then debtor-in-possession CBL. He further ordered

that one Peter McLoughlin be hired as operating officer of the debtor, with both he and Poulos, as counsel for CBL, having joint check-signing authority. Approximately one month after being hired, McLoughlin died leaving the control and operation of the debtor's business ostensibly in the hands of Poulos.[5]

Despite Poulos' withdrawal as counsel in the Kontaratoses Chapter 11 cases, counsel for the Maine Public Utilities Commission (PUC), Roger Hale and Depositers Trust Company, two creditors with asserted security interests in the Kontaratoses' CBL stock, continued to press for disqualification of Poulos as CBL's counsel. After a hearing on December 15, 1980, Judge Cyr denied all motions to disqualify Poulos as CBL's counsel.[6] While various subsequent attempts were made to disqualify Poulos, none included any new grounds for disqualification and none were successful.

From December 1980 until to the appointment of the bankruptcy judge in September 1981,[7] the CBL reorganization case became

---

4. At the time of his withdrawal, Poulos's firm had expended 513.25 hours representing the Kontaratoses (Poulos 329.50 hours; associate 64.50 hours, paralegal 119.25 hours). Poulos waived all claims to the fee when he withdrew from representing the Kontaratoses.

5. This unauthorized reorganization form (neither a debtor nor debtor-in-possession) constituted the basis for the now bankruptcy judge's September 16, 1981 Order authorizing the appointment of a Chapter 11 Trustee, subsequently affirmed on appeal by us in 17 B.R. 946 (Bkrtcy.App. 1st Cir.1982). Poulos, in reliance on the October 23, 1980 Order, claims to have rendered 332 hours as consultant/manager to CBL. His fee application, however, does not include any of these hours.

6. At the hearing on the disqualification motions on December 15, 1980, Judge Cyr stated:

I wish to state on the record and I regret the need to have to do so that these proceedings are contentious. They are important to many people. I have not the slightest evidence before me nor have Mr. Burns [Hale's counsel] or Mr. Furber [the PUC's counsel] brought any today that Mr. Poulos has in any way either failed in his ethical duty or in complying with orders of this Court or with his duties to his client under the statute...
It strikes the Court as inappropriate that counsel should spend so much time endeav-

oring to nullify the effectiveness of each other as representatives of their clients rather than address themselves to the merits of the case. The Court is going to enter an appropriate order as it indicated but would simply implore counsel *to stop this utter, complete waste of time in unprofessionalism in pursuing a matter which seems to this Court to be motivated by their desire to nullify the effective representation of the Debtor and I hope that will be all the Court has to say on the matter.*"

(Tr. 12/15/80) (emphasis supplied).
Judge Cyr then went on to find in the Order that:

"a principal purpose of the instant Motion and of the earlier Application for the disqualification of Richard E. Poulos, Esquire as counsel for CBL has been to hinder and delay the effective representation of CBL by its present experienced and knowledgeable counsel...."

(December 15, 1980 Order of Cyr, J.)

7. Bankruptcy Judge Cyr presided over CBL and Kontaratoses' Chapter 11 proceedings until his appointment to the United States District Court in June, 1981 when the case was transferred to Bankruptcy Judge Frederick A. Johnson for the District of Maine. On August 29, 1981, however, Judge Johnson found it necessary to disqualify himself *sua sponte* under 28 U.S.C.

increasingly bitter and embroiled into what could be described, depending upon the point of view, as a defense of the public interest (Portland, PUC and CBITD's viewpoint) or as a 'take over campaign' (CBL's viewpoint). CBL's attempts to win rate relief or deregulation were met by stiff opposition from the public agencies and the islanders' group, who in turn proposed a plan for acquiring the vessels. While substantial progress towards the confirmation of a plan of reorganization was made in some areas, suffice it to say that the confirmation of CBL's second plan in late August, 1981 was denied because of the objections of these parties.

■ Faced with an unbelievably voluminous record built up during the tenure of the prior two bankruptcy judges, the ever increasing acrimony between the parties and an unauthorized reorganization form, the bankruptcy judge authorized the appointment of a Chapter 11 trustee in September, 1981. While the debtor vigorously opposed such appointment, the insertion of a disinterested party into the battle had the desired effect in that a comprehensive settlement agreement of both the CBL and Kontaratoses' Chapter 11 cases was reached and approved by the bankruptcy court on February 1, 1982. In brief, the settlement agreement provided, *inter alia,* that:

(1) CBL would sell three of its vessels and charter a fourth to CBITD for $535,000.00.

(2) CBL would retain two of its vessels.

(3) All secured creditors would be paid in full in cash upon closing.

(4) After various voluntary reductions by the claimants, all administrative expenses would be paid in full.

(5) All pre-petition unsecured creditors would be paid in full.

(6) Upon closing, all pending appeals, except for appeals relating to the allowance of claims, such as this, would be dismissed.

We take judicial notice,[8] that all the creditors and contingencies contained in the settlement agreement have been satisfied and that the CBL Chapter 11 proceeding was dismissed October 4, 1982.

## THE BANKRUPTCY COURT'S FEE DETERMINATION

After denying Poulos' motion to recuse the third bankruptcy judge at the hearing on fees on February 3, 1982, the bankruptcy judge issued a substantial opinion wherein he allowed debtor's counsel $83,008.00 in fees and $10,000.00 in expenses from Poulos' reduced request[9] for $170,000.00 in fees and $10,000.00 in expenses.

The bankruptcy judge began his analysis by questioning whether CBL's Chapter 11 proceeding, as separate and distinct from the Kontaratoses, should have ever been filed and concluded that CBL's financial difficulties were largely caused by its stockholders. However, recognizing that the CBL's Chapter 11 had been filed and services were rendered by Poulos, the bankruptcy court applied the dozen criteria[10] identi-

§ 455(a). Chief Circuit Judge Frank M. Coffin then designated the bankruptcy judge to preside over both Chapter 11 cases.

**8.** *See In re Cummins,* 20 B.R. 652 (Bkrtcy.App. 9th Cir.1982).

**9.** In order to assure that CBL's modified plan was feasible and that all of CBL's creditors were paid a 100% cash dividend, Poulos had reduced his fee request from $312,301.40 to $235,000.00 plus expenses of $10,000.00. Pursuant to the comprehensive settlement agreement, Poulos further reduced his maximum request to $170,000.00 plus expenses of $10,-000.00.

**10.** *King* listed twelve factors to be considered in determining fees to be awarded pursuant to the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relation-

fied in *King v. Greenblatt,* 560 F.2d 1024 (1st Cir.1977) with a view towards determining the reasonableness of Poulos' fee request in the CBL case.

The court considered the first four factors of *King* together from the perspective of the conditions existing as of the date of filing and determined that the problems presented required very little time and labor, the subject matter was not difficult and required no great skill and nothing concerned with the case should have occupied sufficient time to have precluded other employment. Turning to the customary fee in the community (factor 5), the bankruptcy court emphasized the well-established principle that estates cannot be charged expert rates for routine tasks and cited several non-bankruptcy cases [11] where the maximum allowed hourly rate was $75.00 per hour. As to the 6th factor, whether the fee was fixed or contingent, the bankruptcy court concluded that counsel was at all times assured of payment of the reasonable value of service. Analyzing time limitations imposed by the client or other circumstances (Factor 7), the bankruptcy court criticized the length of the Chapter 11 proceedings and the results debtor's counsel achieved as reflected in the settlement agreement. Considering the amounts involved and the results obtained (Factor 8) the court noted that it had already considered these factors in 3 and 7 and commented that it was somewhat ironic given the results obtained, that the Kontaratoses supported the full fee allowance to Poulos

because the difference between the fee request and the court's final allowance would revert entirely to CBL and this would only serve to enhance the Kontaratoses' equity position in CBL.

With respect to the experience, reputation and ability of debtor's counsel (Factor 9), the court noted that Poulos, a Bankruptcy Referee and Judge of the District of Maine from 1956 to 1975, is a pre-eminent member of the Bankruptcy Bar. As such, however, the bankruptcy court held that Poulos should have realized the problems that would arise from filing both the individual and corporate Chapter 11 petitions. Turning to consideration of the undesirability of the case (Factor 10), the court recognized the acrimonious nature of the case and the severe damage done to the personal and professional relationships of the attorneys involved, but observed that this resulted from the tactics employed and was not inevitable. Since Poulos was hired shortly before the Chapter 11 filing, the court did not draw any conclusions from Factor 11.

The 12th Factor—awards in similar cases—was considered at length by the court. The court stressed the particular facts of the CBL case, and noted that although Poulos felt that he had complied with Maine Bar Rule 3.4(d), *supra,* note 3, by representing the Kontaratoses and CBL with their full knowledge and consent and after full disclosure and approval by the bankruptcy court (Cyr, J.), that Poulos could only be compensated to the extent that his services benefited the CBL estate.[12]

ship with the client; (12) awards in similar cases.

11. *Souza v. Southworth,* 564 F.2d 609 (1st Cir. 1977); *Lund v. Affleck,* 587 F.2d 75 (1st Cir. 1978); *Lamphere v. Brown University,* 610 F.2d 46 (1st Cir.1979); *Pilkington v. Bevilacqua,* 632 F.2d 922 (1st Cir.1980).

12. Additionally, the court cited cases for the proposition that courts have authority to deny all compensation to counsel representing adverse interests. *See Woods v. City National Bank,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941); *Silbiger v. Prudence Bonds Corp.,* 180 F.2d 917 (2nd Cir.1950) *cert. denied* 340 U.S. 831, 71 S.Ct. 37, 95 L.Ed. 610 (1950). While this is the general rule it should be noted that

in *Silbiger, supra,* at 921, the court said that it is not reasonable to impose an entire fee forfeiture, where the allowed fee comes in no part from any group that could have been prejudiced by the attorney's divided allegiance. In the instant case, all creditors have been paid in full and the only possible group that could have been prejudiced by Poulos divided allegiance, the stockholders of CBL, strongly support his entire fee request. Furthermore, Poulos withdrew from his representation of the Kontaratoses on October 23, 1980 and he was absolved from any conflict of interest by Judge Cyr in December, 1980, long before the bankruptcy judge's designation in September, 1981.

The court next noted the amount of time expended on the drafting and execution of the settlement (whereby the Kontaratoses acknowledged their obligation to repay the monies withdrawn from CBL) was disproportionate to the fact that this had long been verbally agreed to by the parties. The bankruptcy court went on to criticize the quasi-trustee status imposed on Poulos by the operating Order of October 23, 1980 (Cyr, J.) but concluded that the judicial authorization for the performance of these services entitled Poulos to compensation to the extent his services benefited the estate.[13]

On the basis of his analysis of the twelve *Greenblatt* criteria, the bankruptcy judge reduced the hourly rate of debtor's counsel from a request of $125.00 per hour for 2,266.75 hours of Poulos' time and $40.00 per hour for 457.25 hours of associates' time (a weighted average hourly rate of approximately $119.00 per hour) to a combined average hourly rate of $70.00 per hour. The court established the hourly rate of the paralegal time at the requested $20.00 per hour rate.

The bankruptcy court next undertook to determine what hours were reasonably expended by Poulos as counsel to the debtor-in-possession and debtor. Poulos' fee application delineated twenty-one separate tasks performed by his firm as counsel to the debtor-in-possession from June 1980 to the appointment of a Chapter 11 trustee in September, 1981. Poulos expended 1,733.25 hours, his associate 465.75 hours and his paralegal 578.55 hours. Subsequent to the appointment of a trustee in September, 1981, until the execution of the settlement agreement, Poulos in his fee application identifies eleven separate tasks performed by his firm as counsel to the debtor, CBL. (Poulos 493.75 hours, associates 38.75 hours, paralegal 110.75 hours). The total time requested, both pre-and post-trustee, was: Poulos, 2,266.75 hours; Associates, 457 hours and; Paralegal, 689 hours.

The bankruptcy court examined each of the 32 claimed tasks from the viewpoint that it had expressed earlier in the opinion when it discussed the twelve *Greenblatt* criteria. The court's analysis resulted in the reduction of the hours claimed in 24 of the 32 categories, ranging from a 100% disallowance of hours (6 categories) to the disallowance of 50% or more of the hours claimed (18 categories). The net effect of these reductions resulted in a final allowance of 1,107.25 hours of attorney time and 275 hours of paralegal time, from an original request of 2,723.75 hours of attorney time and 689 hours of paralegal time. The bankruptcy court then multiplied the $70.00 hourly rate by the allowed hours to arrive at the allowed fee of $83,008.00 plus $10,-000.00 in expenses.

## LEGAL FEES IN BANKRUPTCY PROCEEDINGS

■ Bankruptcy courts are accorded broad discretion in determining reasonable fee allowances, *Dickinson Industrial Site v. Cowan,* 309 U.S. 382, 60 S.Ct. 595, 84 L.Ed. 819 1940), and their decision should be disturbed only upon a showing of an abuse of that discretion. *See, e.g., Matter of U.S. Golf Corp.,* 639 F.2d 1197, 1201 (5th Cir. 1981); *In re First Colonial Corp. of America,* 544 F.2d 1291, 1298 (5th Cir.1977) *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *In re Boteiho,* 8 B.R. 305, 306 (Bkrtcy.App. 1st Cir.1981).

The analysis of attorneys' fees in bankruptcy proceedings begins with Section 330 of the Bankruptcy Code (Code), 11 U.S.C. § 330 (1980), which provides that the bankruptcy court, after notice and hearing, may award:

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee professional person, or attorney, as the case may be, based on the

---

**13.** Apparently, the court was unaware that Poulos' fee application did not include the 332 hours devoted to managerial/consulting services. *See* note 4. In any case, no compensation was allowed for such time.

time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

The policy of section 330 is to compensate attorneys serving in bankruptcy cases at rates comparable to those earned by attorneys performing similar services outside of Title 11 and thus expressly overrule the notions of conservation of the estate and economy of administration which were applicable under the Bankruptcy Act, (Act), as enunciated in the Act case of *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1976). H.R.Rep. No. 595, 95th Cong., 1st Sess. 330 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News, 5787, 6286. The rationale behind the change from the strict economy policy of *Beverly Crest* to a 'market place' standard is due to the finding of Congress that:

> If that case were allowed to stand attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. *Id.*

Aside from the abandonment of the principle of economy and the express allowance of interim compensation,[14] the basic criteria for determining reasonable compensation developed under the Act is applicable in construing section 330 of the Code. *See, e.g., Matter of Hamilton Hardware Co., Inc.*, 11 B.R. 326 (Bkrtcy.E.D.Mich.1981); *In re Garland Corp.*, 8 B.R. 826 (Bkrtcy.D. Mass.1981); 2 *Collier on Bankruptcy* ¶ 330.-05[2] (15th Ed. 1980).

Under the Act, many courts looked for guidance in their fee determinations in bankruptcy cases to the twelve criteria originally espoused in *Johnson v. Georgia Highway Express* 488 F.2d 714, a Civil Rights Act case, and adopted by this Circuit in *King v. Greenblatt, supra.* The *Johnson* standards were first adopted in a bankruptcy case in *First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir.1977) *cert.* denied 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977) with the addition of two other factors: first, the spirit of economy (no longer applicable to Code cases) and second, the avoidance of duplication of effort by the various professionals. The *Johnson* factors have since been cited as a point of reference in numerous other bankruptcy cases. *See, e.g., Matter of U.S. Golf Corp, supra; Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088 (5th Cir.1980); *In re Lloyd Carr & Co.*, 2 B.R. 714 (D.Mass.1979).

In the practical sense, however, the delineation of twelve rubrics does little to assist in the trial court's determination of a reasonable fee allowance.[15] The court in *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) made the telling comment that:

> The fundamental problem with an approach that does no more than assure that the lower courts will consider a plethora of conflicting and at least partially redundant factors is that it provides no analytical framework for their application. It offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or, indeed, how they are to be applied at all. *Id.* at 890 (cites omitted).

The overlapping and redundant nature of the *Johnson/Greenblatt* criteria has been recognized by a number of courts and commentators as often producing an inequitable result.[16]

---

**14.** 11 U.S.C. § 331.

**15.** Commenting upon one of the standard litanies containing eight factors that should determine fees, the court in *City of Detroit v. Grinnel Corp.*, 495 F.2d 448, 470 (2nd Cir.1974) noted, "this conceptual amalgam is so exten-

sive and ponderous that it is probably not employed in any precise way by those courts espousing adherence to it."

**16.** For example, a high-powered attorney has his fee increased threefold as factors (3) (skill), (5) (customary charge), and (9) (experience)

In recognition of the deficiencies inherent in the *Johnson* approach but not in abrogation thereof, the "lodestar" [17] theory for fee setting developed. Originally adopted by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Sanitary Corp.,* 487 F.2d 161 (1973) and in this Circuit in *Furtado v. Bishop,* 635 F.2d 915 (1980), the lodestar is an attempt to provide an analytical framework for the trial court's application of the *Johnson/King* criteria. The lodestar fee-setting inquiry begins with the calculation of the lodestar: the number of hours reasonably expended on the case multiplied by a reasonable hourly rate. The figure derived from this computation is crucial as it is recognized as "the only reasonably objective starting point for awarding a fee". *Copeland v. Marsland, supra,* at 891.

In order to make the lodestar the guiding star of a trial court's fee award and to avoid a number derived from a mechanical computation, however, the trial court must apply certain of the subjective *Johnson* factors to arrive at a 'reasonable' hourly rate and the number of hours 'reasonably' expended. The determination of a reasonable hourly fee in a bankruptcy case requires consideration of some, if not all of the following Johnson criteria: the customary hourly fee (5), the level of skill necessary to perform the services (3), whether the fee is fixed or contingent (6), time limitations (7), the amount to be obtained (8), the reputation of the attorneys (9) and the undesirability of the case (10). Similarly, the hours *actually* expended by an attorney do not necessarily constitute the hours *reasonably* expended. The court "should review the work done to see whether counsel substantially exceeded the bounds of reasonable effort." *Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980). In delineating those boundaries the court should take into account: the time and labor required (1) from the perspective of the novelty and difficulty of the questions presented (2), the opposition encountered,[18] the amount involved (8),[19] the disallowance of duplicative hours and, in non-bankruptcy cases, the disallowance of compensation for time spent litigating issues and claims upon which the party seeking the fee did not ultimately prevail.[20] The "success" test is somewhat similar in a bankruptcy proceeding to an inquiry into what "benefit the estate" derived from counsel's services. However, the straight line equation of "success" with "benefit" for the purpose of shaving hours from a bankruptcy lodestar can often pro-

are considered. Conversely, a young attorney will experience an unfair reduction in his fees: although he might be skillful (3), he is inexperienced (9), cannot prove high customary charges (5), is not precluded from other assignments (4), and will not be hurt by arguing an unpopular cause because his notoriety would help him attract similar cases (10). Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act,* 80 Column L.Rev. 346, 373 N. 163 (1980).

In addition to magnifying a deficiency or strength out of proportion, the *Johnson* criteria are so interdependent that a separate analysis and conclusion for each criteria, is impossible. For example, the customary hourly fee (5), is likely to be influenced by the level of skill necessary to perform the services (3), the novelty and difficulty of the questions (2), time limitations (7), the reputation of the attorneys (9) and the undesirability of the case (10). *Copeland v. Marshall,* 641 F.2d 880, *supra,* at 840.

**17.** *Webster's Third International Dictionary* defines "*lodestar*" as 1: a star that leads or guides; 2: someone or something that serves as a guiding star or as a focus of hope or attention.

**18.** *See, e.g., Wolf v. Frank,* 555 F.2d 1213, 1217 (5th Cir.1977) "Obviously, the more stubborn the opposition the more time would be required"); *Perkins v. New Orleans Athletic Club,* 429 F.Supp. 661, 667 (E.D.La.1976) ("Those who elect a militant defense ... [are responsible for] the time and effort they exact from their opponents.").

**19.** Although this factor might also be taken into account in determining the reasonableness of the hourly rate. See *Copeland v. Marshall, supra,* at 892.

**20.** The consideration of what issues a fee applicant ultimately prevailed upon is necessitated in finding a "lodestar" in antitrust actions under Section 4 of the Clayton Act, 15 U.S.C. § 15, and in action under the Civil Rights Act of 1866, 42 U.S.C. § 1988, because only issues upon which a party ultimately prevailed upon are entitled to be compensated for, in effect, an "all or nothing approach."

duce a skewed analysis. Not only is it often difficult to fractionalize every adversary proceeding, cause of action and dispute in a typical reorganization proceeding (see the discussion of an analogous problem in *Lamphere v. Brown University,* 610 F.2d 46, 47 (1st Cir.1977), a Civil Rights case) but even more importantly, time spent upon an issue which an attorney ultimately loses may be beneficial in connection with the aims of the estate in general.[21] *See, e.g. Matter of Aldersgate Foundation,* 10 B.R. 910, 917–18 (Bkrtcy.N.D.Fla.1981). In short, while a battle may be lost in a reorganization proceeding, it is the result of the war that is paramount.

■ Rather than attempting to grade in the net benefit or results of the reorganization proceeding by making corresponding fine adjustments in the number of hours spent on each and every task undertaken by counsel, we suggest the bankruptcy judge should reserve such an adjustment until the lodestar is determined.[22] *See Copeland, supra,* at 903. In this way the objectivity of the lodestar can at least in some way, be preserved. Of course, hours spent on matters beyond that consistent with a standard of reasonable efficiency and productivity should be stricken from the lodestar calculation, *see Furtado v. Bishop, supra,* at 920, but such an approach ideally should be tempered with a view towards the need for the services at the time they were rendered. *See generally* 12 Collier on Bankruptcy ¶ 219.06 (14th ed. 1975).

■ Multiplying the reasonable hourly rate by the hours reasonably expended produces the lodestar. Then, the "lodestar is adjusted up or down to reflect factors, such as the contingent nature of success in the lawsuit or the quality of legal representation, which have not *already* been taken into account in computing the 'lodestar'

and which are shown to warrant the adjustment by the party proposing it." *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982) (emphasis supplied). Such factors may include, if they were not already taken into account when computing the lodestar, the contingent nature of success and the delay in receipt of payment. *See Copeland v. Marshall, supra,* 892–92. Further the lodestar can be further adjusted to reflect the "quality of representation." This adjustment is appropriate "only when the representation is unusually good or bad, *taking into account the level of skill normally expected* of an attorney commanding the hourly rate used to compute the "lodestar." *Id.* (emphasis supplied).

■ It is under the heading "quality of representation" that a bankruptcy court should particularly consider the results of the attorney's participation in the bankruptcy proceeding, and the benefit to the estate to see if circumstances warrant adjustment of the lodestar figure. Where an attorney's services have produced particularly exceptional benefits for the estate, an upward adjustment of the lodestar may be warranted to compensate for an hourly rate that turned out to be overly conservative. Similarly, if a high-priced attorney performs in a competent but undistinguished manner a decrease in the hourly rate would be warranted. *See Copeland, supra,* at 894.

## APPLICATION OF THE LEGAL FRAMEWORK TO THE BANKRUPTCY JUDGE'S DECISION

■ The bankruptcy court's denial of appellant's renewed motion for the bankruptcy judge's recusal at the fee hearing must be considered. Such a review is limited to determining whether the trial court's evaluation of the evidence amounted to an abuse of discretion. *Blizard v. Frenchette,* 601 F.2d 1217 (1st Cir.1979).

21. For example, if debtor's attorney is successful in staving off a secured creditor's complaint to foreclose upon an item of property essential to a debtor's business and thereby the debtor is able to generate substantial profits during the interim, such time should be compensable even if the property is ultimately reclaimed by the creditor.

22. Similarly, the grading in of a "quality" factor in determining an hourly rate on a task by task basis can also degenerate into a highly subjective process. *See Miles v. Sampson,* 675 F.2d 5, 9 (1st Cir.1982).

■ From what little that can be gleaned from the record, presumably appellant believed the bankruptcy judge was personally biased against him. Since 28 U.S.C. § 144 is not applicable to bankruptcy judges, *Dubnoff v. Goldstein,* 385 F.2d. 717, 720 (2nd Cir.1967), and 28 U.S.C. § 144 only applies to conduct which runs against the party and not the lawyer, *Davis v. Board of School Commissioners of Mobile County,* 517 F.2d. 1044, 1052 (5th Cir.1975), *cert. denied* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), the denial of this motion was clearly proper. Additionally, the bankruptcy judge did not have to reconsider his earlier order denying the recusal motion because appellant did not introduce any new evidence or issues at the fee hearing. *See Matter of REA Holding Corp.,* 2 B.R. 733 (D.C.S.D.N.Y.1980).

We hold, however, that the bankruptcy judge abused his discretion by failing to recognize and properly apply the appropriate legal standard as enunciated in *Furtado* and its progeny. The bankruptcy court's application of the *Greenblatt* criteria resulted in an inequitable magnification of the deficiencies present in appellant's representation of CBL. Further, the court's "benefit" analysis, whereby it reduced the hours spent, was inappropriately narrow in the circumstances of this case. Essentially, we see the bankruptcy court's decision as a classic example of the confusion inherent in the *Johnson/Greenblatt* criteria.

The bankruptcy court made two initial factual findings [23] when it applied the *Johnson* criteria, with which we agree: First, that at the outset of the CBL proceedings, the reorganization proceeding did not appear particularly difficult or necessary due to large equity to debt ratio. Second, that appellant should not have filed both the individual and corporate Chapter 11 petitions. We do disagree however, as to the extent to which these two factors influenced the entire fee setting determination of the bankruptcy judge.

As to the first, assuming that no specific finding of a "bad faith" filing is made, but the court feels the filing was inadvisable, the court should have made a discount in one or two of the *Greenblatt* criteria, or, more appropriately we think, a qualitative downward adjustment of the lodestar. In the instant case, the advisability of filing the reorganization case was a substantial factor in the drawing of a negative conclusion with respect to the first *seven* of the *Greenblatt* criteria. The magnification of this one factor by virtue of the *Greenblatt* approach created a situation whereby the bankruptcy court (although recognizing that once the Chapter 11 was filed the services should be compensated to the extent they were necessary and aided in the reorganization of CBL) was locked into the viewpoint that little in the way of services were required to extricate CBL from the Chapter 11. This conceptual framework hindered the bankruptcy judge's appreciation of the actual facts as they unfolded during the reorganization proceeding.

■ Additionally, the bankruptcy judge's evaluation of all twelve of the *Johnson* criteria for the purpose of determining a reasonable *hourly rate* is illsuited as many of these factors were properly related to the determination of what number of hours were reasonably expended under the circumstances. Applying these factors (principally one and two) on one side of the lodestar equation (the hourly rate) when they necessarily have to be considered on the other side (the number of hours) results in a "double deduction." Just as a lodestar should not be adjusted upward or downward by factors that were already taken into account when computing the lodestar, *Miles v. Sampson, supra,* at 9, the lodestar itself should not be the product of multiplying the same factor twice. While we recognize that the line of demarcation is often difficult to draw (i.e. the skill required (3)

---

**23.** Contrary to appellant's assertions, we do not find that the bankruptcy judge's fee determination was limited to what was introduced at the fee hearing or to what the judge was requested to take judicial notice of. This assertion is inimicable to the entire fee-setting process.

may influence both the hourly rate and the number of hours required) the trial court should strive to avoid this duplication. Here, that was not done.

The second fact that permeates the bankruptcy court's analysis (and concomitantly assumes drastic proportions by virtue of the incorrect application of the *Johnson* criteria) is the appellant's initial representation of both CBL and the Kontaratoses. Poulos was remiss in believing that he could adequately represent both the equity holders and the corporation in a bankruptcy proceeding, especially where there was the admitted liability of the former to the latter. Poulos' full disclosure to the court and to his clients of the conflict and the misappropriations and the subsequent judicial *imprimatur* upon that representation did not cure that defect. It is only when Poulos withdrew from his representation of the Kontaratoses (and they retained other counsel) and he agreed to waive any fee with respect to that representation that his position became at all tenable. Judge Cyr's December 15, 1980 order specifically finding that no further grounds existed to disqualify Poulos as CBL's counsel, established the law of the case as to his legitimacy because no new grounds were ever asserted after the entry of that order and no finding of a conflict was ever made by the judges below. *See generally Peterson v. Federated Development Co.,* 416 F.Supp. 466, 473–74 (S.D.N.Y.1976) (a district judge's departure from a ruling made by his predecessor judge requires a clear conviction of error).

The bankruptcy court's disapproval of Poulos's initial representation of both of the debtors is present in its application of *Greenblatt* in factors 9, 10, and particularly 12 (awards in similar cases). The bankruptcy court's application of factor 12 (awards in similar cases) bears no relation to the fixing of a reasonable hourly rate. What the bankruptcy court found to be an excessive amount of time spent on executing the Kontaratoses' acknowledgement of liability to CBL might well be appropriate in considering what hours should be allowed (as it was when the court deducted fourteen hours from the twenty-eight requested) but

should not be interjected into the lodestar, particularly when such facts are neither supported by the record or by specific findings. Similarly, the criticism of Poulos's quasi-trustee status, ordered by the bankruptcy court, is irrelevant to Poulos' hourly rate.

The absence of an analytical framework for the bankruptcy court's application of the *Greenblatt* criteria results in many of the same factors being "spilled" over into the calculation of "the hours reasonably" spent. The bankruptcy court engages in a litmus-like "benefit" test that causes an unwarranted reduction of the hours spent by appellant. For example, in the most significant reduction (over 300 hours), the bankruptcy judge totally disallowed all time spent by debtor's counsel reviewing pleadings, researching, drafting answers, affirmative defenses and counterclaims and attending the proceedings initiated by Depositors, Hale, the City of Portland and the CBIDA for the appointment of a trustee and for the disqualification of Poulos as attorney for CBL. The court's rationale for this disallowance ("none of this time yielded any benefit to the estate, was largely made necessary by the need for self-justification, and cannot be allowed") departs from the calculation of what hours should be reasonably be rendered by counsel to the debtor-in-possession. It also ignores the prior finding and Order made by Judge Cyr. The debtor-in-possession is the norm in a Chapter 11 proceeding and the debtor-in-possession should not be removed without a finding of "cause" *See* 11 U.S.C. 1107 and 11 U.S.C. § 1108. The Code envisions that the finding of "cause" takes place in the context of an adversary proceeding and, as such, the debtor-in-possession is entitled to counsel. The bankruptcy court's denial of compensation under the guise of a benefit analysis (because he later found that circumstances warranted the appointment of a trustee) is in effect a nullification of a right afforded by statute. *See generally Philadelphia & Reading Coal & Iron Co.,* 61 F.Supp. 120 (E.D.Pa.1945) (a Chapter X proceeding).

Similarly, the disallowance of all time spent opposing the motions for disqualification of Poulos as CBL's counsel, was also inappropriate in light of Judge Cyr's finding that these attempts were made to nullify the effective representation of the debtor's interests in these proceedings. The reorganization process is at best the reconciliation of conflicting views and rights as reflected in a financial readjustment. Those conflicting views are entitled to able and partisan representation. The benefit analysis employed by the bankruptcy court cannot be so strongly construed as to stifle the voices of those participating in the reorganization proceeding. Of course, it is the bankruptcy court's prerogative to strike those services which exceeded the bounds of reasonable efficiency and productivity. The total dissallowance of these hours, however, constitutes an abuse of discretion.

■ In a similar mode, the bankruptcy court disallowed all time (30 hours) spent subsequent to the appointment of the Chapter 11 trustee regarding the debtor's opposition to CBITD's takeover plan on the basis that "[n]one of the above hours yielded any benefit to the estate and they [the hours] are all disallowed." This restrictive interpretation of "benefit to the estate" is contrary to the well-established rule that services rendered in successfully opposing a plan of reorganization are beneficial to the estate. *See e.g., In re Porto Rican American Tobacco,* 117 F.2d. 599 (2nd Cir.1941); *Matter of Aldersgate Foundation Inc.,* 10 B.R. 910 (Bkrtcy.N.D.Fla.1981).

■ Further illustrative of the extent to which the bankruptcy judge's initial views of the case were magnified by the unguided application of the *Greenblatt* criteria is his disallowance of nearly 50% of the time spent for preparation and attendance at all the meetings of the creditors. The bankruptcy judge did so on the basis that "[s]ince creditors were always going to be paid in full, extensive meetings should not have been necessary." The inadvisability of filing the Chapter 11 petition was presumably a factor in the bankruptcy court's reduction of the allowed hourly rate. Once

enmeshed in the Chapter 11 proceeding, the necessity for the services should have been determined *at the time* when they were rendered. Consultation with a creditors' committee and attendance at the administrative meetings conducted by the United States Trustee in Chapter 11 proceedings, is a duty of a debtor-in-possession and such time should be compensated for, absent a showing that the hours are inflated. Such services are clearly necessary and beneficial to the estate's general goals.

The bankruptcy judge's allowance of 50 out of 210 hours of attorney time devoted to negotiations and litigation involving Hale, Depositors, the PUC and others regarding financing for a plan of reorganization serves as a final illustration of the restrictiveness of the bankruptcy court's approach. The court found that "[a]ll of this time should not have been necessary just to set up the settlement and financing agreement which never did go through, and in any event, was primarily for the stock holders benefit." To the extent that the disallowance was based upon a finding by the court that the time exceeded the bounds of reasonable effort, we defer to that decision. However, the fact that parties settlement agreement was not executed as originally designed did not abrogate any progress that the parties made through these discussions. Debtor's counsel is generally the primary force behind any reorganization effort and his good faith attempt to negotiate the funding of a plan of reorganization should not be hindered by a success test. *See, e.g. In re International Horizons, Inc.,* 10 B.R. 895, 900 (Bkrtcy.N.D.Ga.1981). Furthermore, the fact that the Kontaratoses, as equity holders, would benefit from the confirmation of a plan of reorganization is irrelevant to the reasonableness and necessity for the hours rendered as all parties would benefit from the confirmation of a Plan.

■ Although we discern various other errors comparable to those delineated above in the bankruptcy court's disallowance of

hours,[23A] we do not feel it necessary to further examine each of 'the other 20 categories in which deductions were made. We hold that the bankruptcy court abused its discretion in fixing appellant's fees by applying improper legal standards in its determination. *See Matter of First Colonial Corp., supra,* at 1298. Since the amount of the award of attorneys' fees is to be determined by the trial court and the role of an appellate court is to review for errors of law or abuse of discretion ordinarily we would remand to the trial court for a determination in light of our holding.

We do not believe, however, that under the circumstance it would be productive to remand this case for new computations. Two and one half years have elapsed since this case was filed. This Panel and three bankruptcy judges have spent an inordinate amount of time on these proceedings. The comprehensive settlement agreement has resulted in the dismissal of the CBL case and we do not see the need for prolonging this matter.[24] Additionally, one of the reasons for having the trial judge fix the fees is that he had the opportunity to observe the applicant's performance on a day-to-day basis and therefore has a far better basis for determining reasonable fees. *See Trustees v. Greenough,* 105 U.S. 527, 537, 26 L.Ed. 1137 (1882). In the instant case, most of appellant's services were rendered prior to the designation of the bankruptcy judge and therefore we are just as well advised as the bankruptcy judge with regard to the value of these services. *Fuller v. Memphis Street Ry. & Co.,* 110 F.2d 577 (6th Cir.1940) (where the services in a Chapter X proceeding were rendered during the incumbency of a previous judge, the appellate court would determine the fees). As we are ourselves experts in assessing the reasonableness of an attorney's fee award,[25] we shall do so. *See, e.g., In re Copeland, supra,* at 902, *In re TMT Trailer Ferry, Inc.,* 577 F.2d 1296, 1304 (5th Cir.1978); *B–M–G–Inv. Co. v. Continental/Moss Gordin, Inc.,* 437 F.2d 892, 893 (5th Cir.1971), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1668, 29 L.Ed.2d 154 (1971).

This matter should not be left without the Panel being recorded as saying that the now bankruptcy judge's designation as the third judge in charge of this case was perhaps the only happy event in the whole proceedings. It was a remarkably venomous contest, peopled on both sides by bitter and relentless adversaries, as the appeals record will indicate. It was a very difficult case to handle, particularly by a judge by inheritance who had to wade into the thicket of prior proceedings; it was done with great skill and brought to a conclusion. Had it not been for his designation, the parties would no doubt still be given the chance to exhibit their hostility.

## APPELLANT'S FEE AWARD

The bankruptcy court's incorrect application of redundant *Johnson* criteria has produced a skewed determination with respect to both the allowed hourly rate and the number of allowed hours. We do not intend to impose rigid guidelines or structure upon the format that a fee opinion must take as we feel individual styles and the circumstances of each particular case (the

**23A.** For example, the bankruptcy court totally disallowed over 200 hours spent by appellant's firm for research and analysis relative to the Public Utilities Commission's (PUC) jurisdiction, intervention, contempt and audit powers. The court's rationale ("[n]one of this time benefited this Debtor's estate and in part involved a defense of the Kontaratos' [sic] . . . [and] basic research should be performed by associates . . .) ignores the prior Finding by Judge Cyr preliminarily enjoining the contempt proceedings initiated by the PUC because he found that the PUC's action would severely dispute CBL's operations and impair its reorganization efforts. (July 10, 1980 Order of Cyr, J.) Clearly,

the prevention of such disruption is beneficial to the estate. Further, if such research should be done by associates, there is no basis for the bankruptcy judge's disallowance of the entire eighty hours spent by Poulos' associate on this matter.

**24.** "[We] will not remand a case for more specific findings if doing so will consume precious time and judicial resources without serving any purpose." *Lasalle Extension Univ. v. FTC,* 627 F.2d 481, 483 (D.C.Cir.1980).

**25.** *See Copeland v. Marshall, supra,* at 902 n. 43 and cases cited therein.

number of fee applicants, the length of the proceeding, the magnitude of the award and the like) might warrant some departure from the analysis we have suggested is appropriate. It is essential, however, that the bankruptcy court avoid allowing certain factors or assumptions from dominating its analysis. The lodestar approach is the best method for avoiding an inequitable result.

We are prepared to allow Appellant's fee request to the full amount negotiated pursuant to the settlement agreement. We are more than satisfied that, even given the hourly rate established by the bankruptcy court (which in itself we found to be erroneous), sufficient hours were rendered that benefited the estate to justify such an allowance. This is particularly so because over 300 hours were rendered in good faith by appellant as quasi-trustee when CBL was a debtor-in-possession. While this was later found to be a situation requiring the appointment of a trustee, the services rendered by Poulos were necessary and beneficial to the estate. A trustee would have been entitled to compensation for services during this period. The subsequent finding by the bankruptcy court that these services should have been performed by a trustee, does not abrogate the equitable right to compensation for such services. *Cf.* 11 U.S.C. § 363(m) and 11 U.S.C. § 364(e).

In the circumstances of this case, it is important to recognize that the equity holders support and are able to pay the $170,000.00 fee to Poulos. Only the equity security holders of the post-dismissal debtor, CBL, will benefit from a reduced allowance to debtor's counsel. While the ability to pay in itself cannot be made the basis for increased allowance [*In re Philadelphia & Reading Coal & Iron Co.,* 61 F.Supp. 120 (D.Pa.1945)], where the reorganized debtor is amply able to pay, drastic and unwarranted reduction of allowances to those who contributed to the reorganization will not be permitted. *Matter of Mountain State's Power Co.,* 118 F.2d 405 (3rd Cir.1941). Although the reorganization in this case assumed the form of a conditional dismissal whereby all creditors were paid in full, the distinction is one without a difference.

Accordingly, the order of the bankruptcy court is AFFIRMED IN PART; REVERSED IN PART and appellant's allowance is: $170,000.00 fee and $10,000.00 expenses.